UNION CARBIDE AND CARBON COR-PORATION and Vanadium Corporation of America, Appellants,

v.

Frank NISLEY, Jr., et al., Appellees.

UNION CARBIDE AND CARBON COR-PORATION and Vanadium Corporation of America, Appellants,

v.

John F. WADE et al., Appellees.

UNION CARBIDE AND CARBON COR-PORATION and Vanadium Corporation of America, Appellants,

v.

Howard BALSLEY et al., Appellees.

UNION CARBIDE AND CARBON COR-PORATION and Vanadium Corporation of America, Appellants,

v.

UNNAMED PLAINTIFFS, Appellees.

Nos. 6319–6322.

United States Court of Appeals Tenth Circuit.

Dec. 27, 1961.

Rehearing Denied April 26, 1962.

564.

566

Richard J. Archer, San Francisco, Cal., and Dennis McCarthy, Salt Lake City, Utah (Herbert W. Clark, Howard M. Downs, Douglas C. White, Richard H. Floum and Paul E. Homrighausen, San Francisco, Cal., were with them on brief), for appellant Union Carbide Corp.

J. G. Holland, Denver, Colo. (Robert P. Davison, Denver, Colo., William C. Mc-Clearn, Denver, Colo., Edward R. Neaher, New York City, Calvin A. Behle and Keith E. Taylor, Salt Lake City, Utah, were with him on the brief), for appellant Vanadium Corp. of America.

Joseph L. Alioto, San Francisco, Cal. (Maxwell Keith, Richard Saveri, Guido Saveri, G. Joseph Bertain, Jr., and Walter F. Calcagno, San Francisco, Cal., were with him on brief), for appellees.

Before MURRAH, Chief Judge, and BRATTON and PICKETT, Circuit Judges.

MURRAH, Chief Judge.

These consolidated appeals are from separate judgments in private Section 4 antitrust suits against defendant-appellants. 38 Stat. 731, 15 U.S.C.A. § 15. Each of the suits is based upon the same alleged 20-year combination and conspiracy under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C.A. §§ 1, 2, to monopolize, attempt to monopolize and restrain interstate trade in the source, production and processing of vanadium-bearing ore on the Colorado Plateau, and the interstate marketing of its metallurgical products. Each of the plaintiffs claims damages for injury to his business and property by reason of

the predatory effects of the alleged master conspiracy. The suits largely involve common issues of facts and law, and were consolidated for trial.

The complaint in the so-called Balsley case (No. 6321) states the basic combination, conspiracy and operative facts common to all of the cases. It is cast in two counts. Count one is by thirty-six named independent ore miners on the Colorado Plateau who mined and sold vanadium-bearing ore to defendants during all or a part of the alleged combination and conspiracy, and who complain of injury by reason of alleged monopolistic and conspiratorial price-fixing practices of the defendants. The second count of this complaint is a class action under 23(a) (3) F.R.Civ.P., 28 U.S.C., in which the plaintiff-miners in count one seek to enforce the several rights of the same class of unnamed independent miners on the Colorado Plateau.

On the latter count, the factual question of the existence of the conspiracy and its total impact on the class was submitted to the jury, leaving to the court the function of assessing the amount of damages to any member of the class after notice and hearing. The defendants have perfected an interlocutory appeal under Section 1292, 28 U.S.C., 72 Stat. 348, from an order on a jury verdict in favor of the class, in which they challenge the propriety of the class action, and that matter will be hereinafter fully considered.

In Number 6319, Nisley and Wilson are independent millmen on the Plateau, who claim to have been injured in their business and property by reason of the impact of the combination and conspiracy. Wade and his co-plaintiffs in Number 6320 were millmen, who also operated mining claims on the Plateau. They claim to have been injuriously excluded from competition with the defendants by force of the alleged monopoly and conspiracy.

To each of the separate claims, appellants have pleaded the 4-year statute of limitations as a bar to recovery. § 4B

Act of July 7, 1955, 69 Stat. 283; 15 U.S.C.A. § 15b. The applicability of the statute of limitations involves a complexity of statutory suspension, tolling and tacking, relied upon by plaintiffs to avoid the statutory bar and to sustain recovery for all matters complained of from 1938 to the filing of the suits in 1958. Since the incidence of the statute of limitation goes to the heart of the right of recovery, we shall first consider the measure of its applicability.

The combination and conspiracy is alleged to have been formed in 1933, and recovery thereon was allowed from 1938 to the date of the filing of the suits. When the suits were filed, Section 4 of the Clayton Act had been amended in 1955 (69 Stat. 283, § 4B, 15 U.S.C.A. § 15b), to provide a uniform 4-year statute of limitations to actions arising thereunder, and providing also that no cause of action barred under existing law on the effective date of the Act (January 7, 1956) shall be revived. And, Section 5 of the Clayton Act, as amended in 1955, provided in presently material part that:

"(b) Whenever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws, but not including an action under section 15a of this title the running of the statute of limitations in respect of every private right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter; Provided, however, that whenever the running of the statute of limitations in respect of a cause of action arising under Section 15 of this title is suspended hereunder, any action to enforce such cause of action shall be forever barred unless commenced either within the period of suspension or within four years after the cause of action accrued."

From this it follows that the right to recover damages accruing by reason of

the alleged conspiracy prior to June 1954 is barred, unless the running of the statute is suspended by the pendency of a criminal information against these defendants filed in September 1948, and terminated on June 2, 1957. These suits were filed within one year after termination of the information, and the appellees rely upon its pendency and a prior indictment against the same defendants filed in June 1946, and dismissed on the date of the filing of the criminal information in September 1948. To further toll the statute beyond the pendency of the indictment and subsequent information, appellees invoke the so-called 1942 war-time tolling statutes, 56 Stat. 781, as amended, 59 Stat. 306, 15 U.S.C.A. § 16 note under which all statutes of limitation applicable to antitrust violations were suspended until June 30, 1946.

If, as the trial court held, these asserted private rights of action can be said to be "based in whole or in part on any matter complained of" in the criminal information together with the indictment, and the war-time tolling statutes are applicable, they cumulatively operate to toll or suspend the running of the 4-year statute to October 10, 1942, and thus allow recovery for the actionable period laid in the suits, i. e., 1938 to 1958. But, appellants earnestly contend that their plea in bar should have been sustained because these suits are not based in whole or in part upon the information or the indictment, and in any event, the indictment cannot be tacked to the information so as to suspend the bar beyond the pendency of the information.

In the first place, they say that under prevailing law, in order for the private suits to be based in whole or in part on the information, the matter complained of therein must be "virtually identical" to the matter complained of in the information, i. e., the private litigants must rely not only upon the same general conspiracy, but upon the same means to achieve the same objectives of the same conspiracy. In sum, the appellants take the position that the words "private right of action" in Section 5(b) mean an overt act committed in furtherance of a general conspiracy; and the words "based in whole or in part on any matter complained of" mean in whole or in part of any such overt act complained of in a government proceedings; and that the criminal information is therefore ineffectual to suspend the running of the statute of limitations against any overt act or right of action asserted in the private suits which are not identifiable in the information. Making application of this admittedly strict construction of the statute, and considering each overt act as a "private right of action," they point out that the asserted rights of action and the information do not coincide either with respect to time or subject matter.

It is apparently true, as appellants suggest, that alleged overt acts in furtherance of the conspiracy prior to December 13, 1941, were not chargeable in the indictment or information. And, it is true of course that overt acts occurring after June 1, 1946, were not within the indictment filed on that date, or within the information, which did not charge any subsequent overt acts. Nor did the information complain of the activities of the defendants while acting as agent of the government under a contract with a government agency known as the Minerals Reserve Company; nor of a conspiracy to monopolize or restrain trade in the uranium content of the ore, as did the private suits. Neither did it complain of the monopolization or conspiracy to monopolize vanadium ore claims nor of individual monopolization or individual attempts to monopolize.

Antitrust actions of this kind are, to be sure, concerned with overt acts done in furtherance of the injury complained of, and there is good authority for construing the statutory words "based in whole or in part on any matter complained of" to mean overt acts complained of by the United States in a government suit. See Steiner v. 20th Century-Fox Film Corp., 9 Cir., 232 F.2d 190. This interpretation of the critical words is said to be supported by Congressional

history of the legislation, and by the preceding and related Subsection (a) of Section 5, which provides in substance that a final judgment or decree rendered in a criminal prosecution under the anti-trust laws to the effect that a defendant had violated such laws, shall be prima facie evidence against such defendant in any suit or proceedings brought by any party against such defendant under such laws as to all matters respecting which the judgment or decree would be an estoppel as between the parties there-to. Construing the two paragraphs to-gether (5(a) and 5(b) ), and making application of the general rules of estop-pel, it is suggested that since a final judgment in a government suit would be admissible as evidence in a private suit only as to matters complained of and decided in the government suit, the run-ning of the statute of limitations with respect to matters not complained of would not be suspended. See Steiner v. 20th Century-Fox Film Corp., supra.

■ The two paragraphs are indeed complementary and should be construed together. See Sun Theatre Corp. v. RKO Radio Pictures, 7 Cir., 213 F.2d 284; Fifth & Walnut, Inc. v. Loew's, Inc., 2 Cir., 176 F.2d 587, 593. But, we do not think they are necessarily co-exten-sive in their frame of reference. The purpose of the first paragraph of Section 5 was "to minimize the burdens of liti-gation for injured private suitors by making available to them all matters previously established by the Government in antitrust actions"; and to that end "to confer, subject only to a defendant's

enjoyment of its day in court against a new party, as large an advantage as the estoppel doctrine would afford had the Government brought suit." Emich Mo-tors Corp. v. General Motors, 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534.

The corollary purpose of the tolling provisions of the second paragraph of Section 5 is to vouchsafe the intended benefits of related government proceed-ings by suspending the running of the statute of limitations until the termina-tion of the government proceedings, and allowing the private suitor one year thereafter in which to prepare and file his suit.[1] The competency of a govern-ment judgment in a private suit is nec-essarily restricted to the requirements of due process. But the tolling of the stat-ute during the pendency of the govern-ment litigation is not so limited.

■ Making application of the estop-pel doctrine in a private antitrust suit, which alleged that the monopolistic acts and practices of defendants in a local area were steps in the perpetration of a broad nation-wide conspiracy between and among the defendants, we sustained the trial court's admission of the final judgment in the nation-wide conspiracy case as prima facie evidence of the exist-ence of such conspiracy and its localized impact upon the business of the private plaintiff. Loew's, Inc. v. Cinema Amuse-ments, 10 Cir., 210 F.2d 86. See also Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp., 8 Cir., 194 F.2d 846. Sun Theatre Corp. v. RKO Radio Pictures, supra, seems contra, i. e., see 213 F.2d at page 290. But even so,

1. Senate Report No. 619, June 21, 1955, states in part: " * * * There are many instances where the statute of lim-itations as to a private cause of action may nearly have expired before suit is instituted by the Government under the antitrust laws. Although the statute is tolled during the pendency of the pro-ceedings brought by the United States, the plaintiff in a treble-damage action may find himself hard pressed to reap the benefits of the Government suit if, upon its conclusion, he has but a short time remaining to study the Govern-ment's case, estimate his own damages, assess the strength and validity of his suit, and prepare and file his complaint. To alleviate such difficulties, the present bill would extend the tolling period not only for the duration of the Govern-ment's antitrust suit, but for 1 year thereafter. This would guarantee all plaintiffs an adequate period in which to take advantage of Government antitrust proceedings. * * * " U.S.Code Con-gressional and Administrative News, 1955, 84th Congress, 1st Sess., pages 2328, 2332.

we do not think the tolling provisions of the second paragraph of Section 5 are confined to or governed by the evidentiary rules of estoppel, necessarily prevalent in the first paragraph.

If we accept the appellants' interpretation of Section 5(b), a Section 4 plaintiff would be put to the necessity of bringing suit on the same conspiracy alleged in the government suit, or suffer the bar of the statute as to every overt act not complained of in the government suit. This interpretation would lead to a multiplicity of suits with duplication of proof. It would add to the burdens of the private suitor to the harassment of the defendants. We do not think Congress intended any such result. Rather, we think Section 5(b), as amended, was intended to suspend the running of the statute on a Section 4 claim during the pendency of a government-instituted suit which complained of all, or a part of the means relied upon by the private plaintiff to effectuate the same general combination and conspiracy.

These private suits alleged substantially the same conspiracy against the same defendants as in the government suit. They relied upon the same documentary and oral proof to establish the conspiracy, and they also relied "in part" on the same means for the effectuation of the same conspiracy. There was substantial identity of subject matter, and this was sufficient to suspend the running of the statute.

The criminal information was filed on the date the indictment was voluntarily dismissed. The information alleged substantially the same combination and conspiracy against the same parties and substantially the same means for its effectuation. From the time of the filing of the indictment on June 1, 1946, until the termination of the suit on the information, there was pending a government-instituted antitrust suit on which these private suits were based in part, and they operated to suspend the running of the statute of limitations as to such suits.

The appellants claim that the war-time tolling statutes, supra, were superseded by the enactment of the 4-year federal statute of limitations, and were therefore inoperative to toll the running of the statute beyond the filing of the criminal indictment in June 1946. They point to the expressed Congressional concern over the prolongation of antitrust litigation by virtue of the war-time tolling statute, and the disparity brought about by the application of state statutes of limitation. And, they assert the Congressional purpose of the 1955 Amendment was to supersede both the war-time statute and the state statutes. In order to curtail undue prolongation of litigation, the 4-year statute expressly provided that no action barred under existing law on the effective date of the 1955 Amendment would be revived thereby. But we can discern no Congressional purpose to bar any right of action which subsisted by virtue of existing law on the effective date of the Amendment. Indeed, one of the declared purposes of 5(b) (see Footnote 1) was to "extend the tolling period not only for the duration of the Government's antitrust suit, but for 1 year thereafter." Under the proviso in 5(b), supra, a suit to enforce a cause of action under Section 4 is not barred if commenced "either within the period of suspension [i. e., during the pendency of the government suit and one year thereafter] or within 4 years after the cause of action accrued." [2] These suits having been commenced within the period of suspension, i. e., one year from the date of the termination of the informa-

2. Senate Report No. 619, which accompanied the 1955 Amendment, states in pertinent part: " * * * The present bill would assure all plaintiffs of at least 4 years from the time their cause of action accrued in which to institute suit. It would also guarantee every plaintiff at least a year from the close of a Government antitrust suit to prepare his case and file his complaint. But in cases where the plaintiff's action had been suspended by the pendency of a Government antitrust proceeding, he would be required to bring his action either (a) within the suspension period, i. e., within 1 year after the Government suit had

tion, the 4-year statute was inoperative during that period. See Goodfriend v. Kansas City Star Co., D.C., 158 F.Supp. 531; April v. National Cranberry Ass'n, D.C., 168 F.Supp. 919. In that respect, our cases are factually different from Herman Schwabe, Inc. v. United Shoe Machinery, 2 Cir., 274 F.2d 608; United Shoe Machinery v. International Shoe Machinery Corp., 1 Cir., 275 F.2d 459, where the private suits were commenced more than one year after the termination of the government suits, and the 4-year statute became applicable to the asserted causes of action.

The United States Vanadium Corporation and Electro Metallurgical Company, wholly owned subsidiaries of Union Carbide, were dismissed from the pending criminal information on May 21, 1956. The appellants contend that the information thereupon ceased pending against these two defendants, and inasmuch as no private suit was filed against them within one year from the date of termination, the 4-year statute is applicable to all matters complained of against them; that such statutes of limitation are available to the parent corporation; and that having raised the statute as a defense, the trial court erroneously refused to apply it. In other words, Carbide contends that it may be held liable without regard to the statute of limitations running against its subsidiary "only if it actively participated in the conspiracy."

In United States v. United States Vanadium Corporation, 10 Cir., 230 F.2d 646, we held that the criminal proceedings against these particular defendants abated upon their dissolution and merger with the parent corporation. Melrose Distillers v. United States, 359 U.S. 271, 79 S.Ct. 763, 3 L.Ed.2d 800, seems to be to the contrary. But, we have no need to decide whether under that case the running of the statute was suspended during the pendency of the information against the parent defendant, for the actions surely terminated when they were dismissed on May 21, 1956. From that date there was no pending government suit against these defendants to suspend the running of the statute as against them. And, since these suits were not commenced within one year after the termination of the government suits, the 4-year statute applies, unless, as the appellees concede, Union Carbide actively participated in the conspiracy.

■ Without detailing the pertinent evidence at this stage of the appeal, suffice it to say that there was evidence tending to show that these two wholly owned subsidiaries, together with other subsidiaries, were actually incorporated departments or divisions of the parent corporation, by which it carried on an integrated business of mining, processing, converting and marketing vanadium-bearing ore and its refined products. It was not the purpose of the statute of limitations to require the plaintiffs to institute suit against these dissolved corporations in order to avoid the running of the statute as to acts committed in their name while under the direction and control of the parent corporation.

■ Appellants take the further position that in any event, the asserted claims were barred by applicable state statutes of limitation. The theory seems to be that the state statutes of limitation which were applicable and suspended on the effective date of the Amendment in January 1956, thereupon commenced to run on that date, and operated to bar the actions when these suits were commenced in June 1958. The simple and conclusive answer is that even before the 1955 Amendment and the advent of the uniform 4-year statute, the second paragraph of Section 5 of the Clayton Act (38 Stat. 731) operated to suspend the running of all statutes of limitation in respect to each and every right of action which was based in whole or in part on any matter complained of in a government suit. And since, as we hold, the

terminated, or (b) within 4 years after his cause of action accrued. * * * " U.S.Code Congressional and Administrative News, 1955, 84th Congress, 1st Session, p. 2333.

pending information and indictment operated to suspend the running of the statute on these asserted causes of action until one year after termination of the information, they were not barred when the 1955 Amendment became effective. And, since these suits were commenced within the 1-year period, they are not barred by any statute of limitation, state or federal.

We agree with the trial court that the 4-year federal statute of limitation is applicable; that it was suspended from June 4, 1958 back to June 1, 1946 by the pendency of the government suits; tolled from June 30, 1946 back to October 10, 1942 by the war-time tolling statute; and therefore all causes of action accruing before October 10, 1938 are barred.

This brings us to the merits of the cases. Since the Balsley action presents the central issues on appeal, we will first consider the points raised in that case.

## SOME BASIC AND COMMON FACTS.

Carnotite and rosceolite ore, found in paying quantities on the Colorado Plateau, contain both vanadium and uranium. When vanadium is processed and reduced into ferrovanadium, it is useful in the manufacture of alloy steel, and is sold primarily to steel companies in competition with other ferroalloys. Vanadium-bearing ore is first milled and processed into vanadium oxide ($V_2O_5$)— usually at mills or plants located in the mining vicinity—and in this form has no commercial utility. It is then shipped to reduction plants in the Eastern part of the United States where it is converted into ferrovanadium and sold in that form to the steel industry. In the forepart of this alleged conspiracy, and prior to the advent of atomic energy, uranium was used primarily in the ceramic industry, and only high grade uranium ore was marketable for that purpose. The prime element of carnotite and rosceolite ore was vanadium, and in the milling process to produce vanadium oxide, the uranium was discharged as tailings or refuse.

The Vanadium Corporation of America (VCA) was the pioneer and principal producer of ferrovanadium until the Union Carbide and Carbon Corporation (UCCC) entered the industry in 1926. From about 1911 until about 1932, VCA obtained most of its raw material from a high grade vanadium mine in the Republic of Peru. In the beginning, the ore bodies yielded about 50 percent $V_2O_5$ and the ore was shipped directly to VCA reduction plants in the State of Pennsylvania, where it was smelted and refined directly into ferrovanadium. As mining progressed down through the ore bodies, however, the vanadium content diminished until by 1930, the ore yielded less than 10 percent $V_2O_5$, and it became necessary to fuse the ore before reducing it to ferrovanadium. This intermediate process took place originally in Peru at the mine site on an experimental basis and at the reduction plant in Pennsylvania. Because of the diminishment of vanadium content in the ore, and depressive market conditions, VCA ceased to operate its Peru mine in 1931, and for a year or two thereafter supplied its market demand from inventory of fused oxide and ferrovanadium. About this time, VCA acquired vanadium ore deposits and an oxide mill on the Colorado Plateau at Naturita, Colorado, but apparently did not mine the ore or operate the mill until 1940.

Meanwhile, and in 1926, UCCC, after a survey of the available supply of vanadium-bearing ore on the Colorado Plateau and the potential market for ferrovanadium in the steel industry, purchased extensive ore deposits and a vanadium oxide mill at Rifle, Colorado. The Rifle mines and mill were acquired in the name of the wholly owned United States Vanadium Corporation (USV). It also acquired a ferrovanadium plant in Ohio, which it later transferred to its wholly owned Electro Metallurgical Company (Electromet). And still later, it acquired other similar plants in the Eastern part of the United States. It marketed the ferrovanadium to the steel industry through the Electro Metallurgical Sales Corporation (Electromet Sales), another wholly owned corporation.

In 1932, the USV .Colorado mines and mill were closed due to an oversupply (between 3,000,000 and 4,000,000 pounds) of vanadium oxide which was stored at the Colorado plant. In 1933, Electromet sold to VCA 1,000,000 pounds of vanadium oxide ($V_2O_5$) for 80¢ a pound, to be delivered in monthly quantities before December 1934. From 1932 through 1939, VCA purchased from Electromet a total of 2,825,583 pounds of vanadium oxide, which was approximately 20 percent of its then current requirements. In 1936, USV constructed a vanadium oxide mill at Uravan, Colorado, 13 miles from VCA's dormant plant at Naturita. And, in 1938, the capacity of the Uravan plant was doubled, with structural steel furnished by VCA.

With an upsurge in market demand due to national defense and export requirements in 1937, VCA increased its imports from Peru, and in mid-1940, activated its mine and oxide plant at Naturita. In 1942, VCA constructed a vanadium oxide plant for the United States government at Monticello, Utah, and operated it under an agreement with the Metals Reserve Corporation, a United States government agency, until February 1944; and again from February 1945 until April 1946. Also in 1942, USV rebuilt and reactivated its Rifle plant and constructed another plant for the United States government at Durango, Colorado, which it operated until June 1948, at which time the plant was leased by VCA. From 1939 to 1942, USV mined and processed ore from deposits belonging to and controlled by VCA and delivered the vanadium oxide to VCA under a toll agreement for 65¢ and 75¢ per pound.

Approximately 90 percent of the ore milled by USV at its plants came from its own mines. About 70 percent of the ore milled by VCA at its plants came from its own mines. The remainder of the ore was purchased from independent miners on the Colorado Plateau, such as the plaintiffs in the Balsely group. From the very outset, and until 1942, the operating mills on the Colorado Plateau paid identical prices, i. e., 21¢ a pound, for 2 percent vanadium ore. In 1942, the price was simultaneously increased by both companies to 31¢, and this basic uniform price prevailed on the Colorado Plateau until the filing of this suit in 1958. From 1933 to at least 1948, most of the vanadium-bearing ore mined on the Colorado Plateau was milled in plants which were either owned or operated by one of the two companies. The product of these plants, that is $V_2O_5$, was sold on identical price schedules, except sales or interchanges between the two companies. During all of the period complained of (1938 to 1958), VCA and UCCC, through its subsidiaries, controlled almost 100 percent of the ferrovanadium market, with approximately 66 percent to VCA and the remainder to · Electromet. These sales were made to the steel industry on identical price schedules under yearly "requirement contracts."

In sum, it may be taken as an established salient fact that from 1938 until 1948, most all of the domestic vanadium-bearing ore was produced on the Colorado Plateau; that approximately 80 percent of such ore was mined from properties owned by the two companies; and that most of the ore was milled in vanadium plants owned or operated by one of the two companies. Almost all of the vanadium oxide was converted to ferrovanadium in plants owned by the two companies. The two companies controlled the market for ferrovanadium which was sold to the steel companies on requirement contracts at identical prices. From this it is fair to say that the appellants possessed monopolistic and price-fixing powers to bring about the combination and conspiracy complained of in the complaint. Our first question is whether they used those powers for the predatory and unlawful purposes complained of.

## EVIDENCE OF COMBINATION AND CONSPIRACY.

There was competent evidence in support of the alleged combination and conspiracy to the effect that UCCC entered the vanadium field in 1927 for the avowed

purpose of exploiting ferrovanadium as a steel alloy. Its integrated corporate structure was designed to mine, mill, produce and sell vanadium to the steel industry at prices which would enlarge the market in competition with other alloys; and, that by pursuing this aggressive policy in a depressed market, it built up a large inventory of vanadium oxide at its Rifle plant. And, it being no longer profitable for VCA to import Peru ore for its depleted markets, there could be nothing sinister about its purchase of 1,000,000 pounds of USV's surplus oxide to supply its market for ferrovanadium. At 80¢ a pound, over a cost of about 40¢ or 50¢, the transaction was profitable and advantageous to USV—indeed, mutually advantageous.

From the evidence in the record, it is fairly inferable, however, that contemporaneously with the USV-VCA sale in 1933, USV was faced with the alternative whether it would lower the price of oxide and ferrovanadium and attempt to garner a greater share of the alloy market, and perhaps eliminate VCA as a competitor, or negotiate and cooperate with VCA as a friendly competitor. And,

it is fairly inferable that it finally resolved to pursue the latter course. There was evidence of friendly negotiations between the two companies concerning centralized mining and milling of the oxide on the Colorado Plateau. The negotiations went so far as to contemplate the reconstruction of VCA's Naturita dormant mill, to be operated by USV; and that it was finally decided to construct the mill at Uravan, 13 miles away. The construction of the mill in 1936, and its enlargement in 1938, followed by the agreement between the two companies, whereby USV would mine and mill VCA's ore, to be converted into ferrovanadium in VCA's plants to supply VCA markets, is evidence of collusive cooperation between the two companies.

There was direct evidence to the effect that beginning in 1936, USV kept a very close surveillance on the activities of competitors and potential competitors on the Plateau. And, when in 1938, independent miners and millers began to spring up with the increase in market demand for ferrovanadium, USV immediately took steps to forestall competition.[3] USV commenced purchasing ore

3. In an inter-company communication, dated September 14, 1938, from Van Fleet, Vice-president of USV in New York, to Burwell, Production Manager in Colorado, Van Fleet said:

"As I discussed with you the other night on the telephone, it has become very important that we find out accurately and definitely who is producing vanadium ore and where it is going. Along with this, we want to know the quality of the ore shipped so that we can get a line on the pounds of $V_2O_5$. I realize that some of the quality will have to be estimated, but we ought to get a very accurate line on what the shipments have been from southeastern Utah and southwestern Colorado. We may have to do something about this production, and if information could be obtained on what they get for this ore, it would help out. For instance—Harbison told me that he received 42¢ per pound for $V_2O_5$ and 60¢ for $U_3O_8$ on a low-grade Polar Mesa ore, but if the $V_2O_5$ went over 7%, and the $U_3O_8$ over 2%, he received 45¢ per pound of $V_2O_5$ and 80¢ per pound for $U_3O_8$. These are pretty

high prices for us, but it may be necessary to finally do something about it.

"I have an idea that this production of ore which is going to Europe and Japan is quite a quantity of $V_2O_5$, and more than we think it is. I have been talking about this for some time here in New York, stating that the high prices maintained for $V_2O_5$ in Europe invite and stimulate this kind of competition and can eventually support a considerable vanadium business, with possibly later on a plant. * * *

"I hope you will be able to put somebody on this and make a very careful canvass of the situation. If you could have a talk personally with Balsley you could probably find out all about it. In talking to Balsley it would be to his advantage to give you this information because I have an idea that he is not making any too much money out of this business, and it might be made easier for him on some kind of a combination with us if we decide to do something about it, rather than to fight it. We could, of course, run all this business out—but it would not be good policy to hint of this or threaten. * * * * "

from the independent miners in 1938, and in 1939 published its first ore price schedules, in which it quoted a base price of 21¢ per pound for 2 percent ore, which was its estimated cost of producing its own ore. The evidence showed that USV inaugurated an aggressive policy of acquiring the mining claims of the independent miners who were unable to operate their properties at ore prices offered by USV, the only purchaser; that it acquired claims tributary to independent millers in order to dry up their source of supply; and that they purchased the output of independent millers while they had a surplus of oxide, in order to take it off of the market.[4]

With the continued increase in the demand for ferrovanadium, VCA decided to activate its plant at Naturita in 1939. When the plant opened in 1940, they commenced purchasing ore from independent miners, and there was evidence to the effect that VCA agreed with USV that it would pay the same price of 21¢ per pound for 2 percent ore. With the accelerated demand, there was some deviation from the base price in the way of bonuses and hauling differentials, but in the main, the parties pursued and policed the same price schedule.

In recognition of the necessity for increased domestic production of vanadium for the war effort, the United States government entered into a contract with USV on May 9, 1942, whereby USV was designated as its agent to construct and operate the Durango plant and to purchase vanadium-bearing ore suitable for treatment in the plant "at reasonable prices not to exceed 50¢ per pound of vanadium pentoxide ($V_2O_5$) delivered at suitable loading points." There was evi-

dence that at about the same time, USV and VCA mutually agreed to raise the price of 2 percent vanadium ore purchased from independent miners to 31¢ per pound, and that they maintained this price schedule for ore purchased at both VCA's Naturita plant and USV's plant throughout the period complained of.

■ From this it is fair to infer, as did the jury, that some time prior to 1938, the appellants combined and conspired to monopolize or attempt to monopolize, and to restrain interstate trade in the vanadium industry; that they took affirmative and effective steps to fix the prices for the raw ore, fused oxide and ferrovanadium, and to forestall and eliminate competition and to divide the market between them.

## THE MEASURE AND AMOUNT OF DAMAGES.

The Balsley miners claimed and were permitted to recover damages based upon the difference between the price they were paid for the vanadium content of the ore sold to the appellants, and the prices they would have received but for the antitrust violations. They claimed damages based upon the value of the uranium content in the ore delivered to the appellants, and for which they were not paid. They presented their case by dividing their claims into four damage categories:

"(1) *Vanadium content of carnotite ore:* This category included:

"a. All purchases of vanadium by appellants as private buyers from October, 1938 to June, 1958.

"b. All purchases of vanadium by U. S. V. during a period in which they were commissioned by M. R. C.

4. In an inter-corporate communication between Van Fleet and his superior, Gormely, dated September 19, 1938, entitled "Competitive Vanadium Ore Production," Van Fleet reviewed the independent production on the Plateau, giving the names of the producers, the amounts produced and to whom sold, concluding as follows:

"We have already purchased two or three groups of claims which were po-

tential producers and could be the nucleus of an operation. The intensive development during the past year has made it more imperative to continue this policy, and it now appears that we should purchase some properties and possibly install a small plant in southeastern Utah to forestall serious competition. A definite recommendation will be made on this as soon as the field work has been finished."

to acquire carnotite ore. This period ran from May, 1942 to February, 1944.

"(2) *Uranium content of carnotite ore:* This category included:

"a. All purchases of uranium by appellants as private buyers until the Atomic Energy Commission's ore buying program. The period ran from October, 1938 to April, 1948.

"b. All purchases of uranium by U. S. V. during period commissioned by M. R. C. to acquire carnotite ore. This period ran from May, 1942 to February, 1944."

In their answer to interrogatories submitted in the form of the verdict for the unnamed plaintiffs in the class action, the jury specifically found that as to the vanadium purchases by the defendants from the unnamed-miner plaintiffs for the period October 1938 through March 1948, the price per pound for 2 percent vanadium ore should have been 40¢, and 35¢ for the period from April 1948 through May 1958. As to purchases of 2 percent vanadium ore by USV as agent for MRC from June 1942 to February 1944, the jury found that the price should have been 50¢ per pound. With respect to uranium sales, the jury denied any re-covery for the period January 1939 through December 1942. For the period January 1, 1943 to August 31, 1945, the jury found that the per pound price of uranium ore should have been $1.25, and $2.50 per pound for the period September 1, 1945 to March 31, 1948. The form of the verdict for the named plaintiffs did not specify the per pound price which the plaintiffs should have received for the periods set out and as specified in the verdict for the unnamed plaintiffs. How-ever, the recovery as to each class, i. e., the named and unnamed, was based upon the same proof and necessarily computed according to the same formula. The amount of damages awarded each named plaintiff was computed on the basis of their individual ore settlement sheets, which, in each transaction, reflected the amount of ore delivered to the purchaser (USV or VCA), its vanadium content,

and the price paid therefor, as against the price the jury found they would have received but for the violations. For the purpose of calculating the amount of uranium content of the ore sold during these periods, the jury justifiably found that the approximate average ratio of vanadium to uranium for the vanadium-uranium properties on the Colorado Plateau was six to one.

For the purpose of reviewing the factum and amount of damages awarded in the judgment, we shall conveniently observe the same periods and categories as did the jury in arriving at its verdict. But, we shall first consider the recoverability of damages for vanadium ore purchases while USV was acting as the agent for MRC (May 1942 to February 1944) in the prosecution of the government's ore-buying policies. The earnest contention is that the appellants could not have conspired to fix prices with respect to ore purchased by USV acting as agent for the government. As we have seen, the agency agreement between USV and MRC dated May 9, 1942, did make and constitute USV the agent of the government to construct a vanadium plant at Durango, Colorado, and commissioned USV to exert its best efforts to purchase for the account of the government vanadium ores for treatment at the government plants, at reasonable prices not to exceed 50¢ per pound $V_2O_5$.

■■■ The trial court was requested to instruct the jury in substance that the government itself could not violate the antitrust laws; that an agent for the government, acting within the scope of his authority, was likewise immune, and that if the authorized activities of the agent were validly conferred, the fact that the agent may have had illegal private motives in the performance of his authorized duty was irrelevant. It is true, as appellants suggest, that the antitrust laws are inapplicable to government activities. And, it may also be taken as equally true that since the government acts only through its agents, such agents are likewise immune from liability under the statute while acting within the scope

of his authority in the furtherance of a declared governmental policy or legislative scheme. Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315; Asheville Tobacco Board of Trade v. F. T. C., 4 Cir., 263 F.2d 502. Cf. Atchison, Topeka & S. F. Ry. Co. v. Aircoach Transportation Ass'n, 102 U.S.App.D.C. 355, 253 F.2d 877. But there is nothing in this agency contract to justify the inference that the government intended to transgress the antitrust laws. The contract does not purport to authorize USV to fix prices, restrain trade or achieve a monopoly in the vanadium industry, and we will not lightly infer an intention to do so. Cf. Maryland and Virginia Milk Producers Ass'n v. United States, 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880; United States v. Radio Corp. of America, 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354; United States v. Borden Co., 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181.

■ The court, correctly we think, instructed the jury that if the defendants used the agency powers "for the purpose of carrying out or assisting any combination or conspiracy to restrain trade or to monopolize trade in the vanadium industry or any actual monopolization thereof, the fact that they might have been government agents at the time does not immunize their conduct;" and that "a violation of the antitrust laws may be carried out by acts which, standing alone, may be legal, but if they form a part of an illegal combination or conspiracy to restrain or monopolize, then you may consider them with all of the other evidence in the case to arrive at your verdict." The court then proceeded to particularize to the effect that if, in the execution of the government ore-buying program, USV arrived at prices paid the miners as a result of agreement with VCA to pursue a plan to monopolize the vanadium industry, the fact that it was acting as agent for MRC would not immunize otherwise unlawful conduct. "And this is so" said the court, "though government officials knew and tacitly approved the ore-purchasing programs which violated the antitrust laws."

Both the Durango plant and the Monticello plant were constructed with government funds to be operated by USV and VCA respectively for the account of the government in recognition of the urgent need for additional vanadium ore concentrates. The USV-MRC agency contract was designed to subsidize the mining of marginal ores for production in the government-owned and privately operated plants. USV was authorized to and did negotiate various prices for mined ore, depending upon its percentage content which bore upon the cost of mining and transportation. The evidence shows that many contracts were negotiated with miners on the Plateau, including those in the Balsley group, for the payment of varying prices, some below the 31¢ scheduled price, and some above. Of course, a negotiated price based upon grade, haulage and a 10 percent profit, is inconsistent with a conspiracy-fixed price, unless it can be said that the negotiated prices were in themselves designed to further the objectives of the combination and conspiracy. The appellees contend in effect that the negotiated prices were discriminatorily directed toward the effectuation of the monopoly.

It is difficult to determine from this record to what extent the negotiated prices were tainted by the subsisting conspiracy price of 31¢. Some basic facts are important guides in determining to what extent the found conspiracy permeated and influenced the MRC prices. First, there was positive evidence to the effect that contemporaneously with the advent of the government ore-buying program and the USV-MRC contract of May 9, 1942, USV and VCA officials agreed to raise the base price of ore from 21¢ to 31¢ for 2 percent ore, and that throughout the period of the ore-purchasing agency, this basic price prevailed for private purchases of ore for USV and VCA privately owned plants at Naturita and Uravan, despite the accelerated demand for vanadium ore. USV's ore-purchasing officer became its principal ore-purchasing officer under the agency contract. And, it seems fair to say that

he was at least in doubt concerning whether and to what extent the 31¢ privately established base price was to govern the government purchases. Indeed, it is difficult to discern whether he truly served the interest of the MRC ore-buying program, or whether he utilized his powers as a government agent to further the interest of the price-fixing and monopolistic design of an employer, USV. There was evidence to the effect that at least some of the plaintiff miners were unaware of USV's discretion to pay a reasonable price for the ore not to exceed 50¢ per pound.

One of the negotiated purchase contracts was between USV as agent for MRC and VCA, dated March 11, 1943, providing for the payment of 48¢ per pound, plus hauling allowance for 1.5 percent ore.[5] While all of this ore was milled in the government-owned-VCA-operated Monticello plant, at a loss to VCA, it was the highest price paid for ore on the Plateau under the MRC ore-purchasing program. Many of the contemporaneous contracts provided for much lower prices for the same percentage ore. The so-called negotiated prices paid under the USV-MRC agency contract for ore to be processed in government-owned plants, were not intended to yield a profit to the millers. Indeed, the record shows that the Monticello and Durango mills were operated at a loss to the government. The prices were not open-market competitive prices, and ordinarily would not be a permissible element of damages based upon what was received and what would have been received but for the conspiracy. But even so, if, as the jury apparently believed, the prices paid to the independent miners in relation to the prices paid to VCA were discriminatory and intended to effectuate the monopolistic designs, the miners are entitled to recover the difference between the negotiated discriminatory prices and the price which the jury found the miners should have received but for the conspiracy, having in mind the relevant economic factors, including the negotiated price contemporaneously paid to VCA.

In the last analysis, it was for the jury to determine whether the negotiated price was actually a part and parcel of the appellants' design to achieve a monopoly, and whether the negotiated prices to the plaintiff-miners were discriminatorily different from those paid to VCA under the same circumstances. On the whole record, we cannot say that the jury's finding to the effect that the plaintiff miners should have been paid 50¢ per pound for 2 percent vanadium ore purchased by USV under its agency contract with MRC is without rational basis in fact and reason.

FACTUM AND AMOUNT OF DAMAGES FOR VCA-USV PRIVATE VANADIUM ORE PURCHASES FROM OCTOBER 1938 TO MARCH 1948

Appellants complain of the allowance of damages for ore sales during 1938 and 1939, on the grounds that since VCA did not commence purchasing ore on the Plateau prior to mid-1940, there could have been no price-fixing conspiracy, hence no evidence of controlled or predatory prices. But there was evidence from which the jury could reasonably infer that the 1938 and 1939 purchases of ore were made in pursuance of a monopolistic design; and that the prices paid to the independent miners were intended to effectuate and perpetuate the monopoly. The appellants were therefore liable for the difference between a competitive price and the monopolistic one.

The appellees concede the burden of proving (1) that the appellants violated the antitrust laws; (2) that the violations had an injurious impact on the plaintiffs; and (3) that there was sufficient economic data from which the jury could estimate or proximate the amount of damages.

5. Under this contract, VCA sold and delivered to USV, as agents for MRC, 74,-322 tons of 1.5% vanadium ore, or 2,- 229,000 pounds of vanadium $V_2O_5$, for which VCA received $1,333,725.00.

The court clearly instructed the jury to the effect that plaintiffs had the burden of establishing by the greater weight of the evidence the alleged conspiracy to fix prices of uranium-vanadium bearing ore, and to monopolize or attempt to monopolize the vanadium industry; that such unlawful acts proximately caused injury to the property and business of the plaintiffs; that if they found by a greater weight of the evidence that the defendants did so conspire to fix prices and monopolize or attempt to monopolize, and that the plaintiffs were damaged thereby, they might resolve any uncertainty as to amount against the wrongdoer and assess damages upon inferential, as well as direct and positive proof. In that respect, the jury was told that in making their estimates of damages to the plaintiffs, and particularly the price which they would have received but for the violations of the antitrust laws (determined by the jury to be 40¢ per pound for this period), they should consider all of the economic information produced at the trial, including the prices paid under the metal reserve program, and the price range authorized under the MRC-USV agency contract, the cost of production viewed in the light of the profits made, the prices received by VCA for ore it sold to USV as agent for MRC, and any reasonable allocation which the evidence permits of the defendants' profits as between ore, oxide and ferrovanadium.

The appellants complain of a myriad of errors in these instructions. First, they say that even conceding arguendo the existence of a conspiracy, there is no competent evidence to prove with the requisite degree of certainty that the plaintiffs suffered legal injury as a result thereof. Specifically, they deny that the uniform prices paid for the ore—21¢ to May 1942 and 31¢ thereafter—was not the fair market price of the ore. And, in that regard, they point to the fact that no other purchaser and miller of ore on the Colorado Plateau paid more than the so-called fixed prices. They call attention to the periods of soft markets and surpluses for ferrovanadium.

There is no direct evidence tending to show what vanadium ore would have sold for in a free market, absent the conspiracy. As we have seen, the MRC prices were not free market prices, and standing alone were not evidence thereof. But, it is significant, we think, that during the period of war-time scarcity, when the government, through the MRC was subsidizing the production of vanadium ore through negotiated prices not to exceed 50¢ per pound $V_2O_5$, and was paying VCA 48¢ per pound for 1.5% ore, the fixed price of private purchases remained uniform and consistent at 31¢ per pound. In these circumstances, we think it not improper to allow the jury to consider the MRC prices in determining whether, absent the conspiracy, the plaintiff-miners would have received more. During all the period between 1938 and 1948, the defendants were the dominant purchasers and millers of vanadium ore on the Colorado Plateau. They were practically the only processors and sellers of ferrovanadium, the finished product. The jury found from competent evidence that the defendants fixed the price of the raw material which they purchased, and the price for which the finished product would sell, and that they controlled and divided the market between them.

The mere existence of an unlawful conspiracy to fix the price of vanadium ore on the Colorado Plateau, purchased by the defendants from the plaintiffs, does not in and of itself prove legal injury to the sellers of the ore, i. e., that they would have received more for the ore, absent the conspiracy. At the same time, the prolonged existence of a price-fixing conspiracy in an integrated industry such as ours is proof of damages to those whose prices are directly affected thereby. In that respect, our case is noticeably akin to Mandeville Island Farms v. American Crystal Sugar Co., 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328. And see also Fox West Coast Theatres Corp. v. Paradise Theatre Building Corp., 264 F.2d 602, where Judge Fee said for the Ninth Circuit, "The mere unlawful

combination over a period of time to eliminate competition is proof of damage"; and, in Richfield Oil Corp. v. Karseal Corp., 271 F.2d 709, the Ninth Circuit again said that applied restraint would patently result in some loss of business.

The appellants also attack that part of the instructions of the court which told the jury that in estimating damages, they could take into consideration the cost of production viewed in the light of the profits made as allocated between the raw ore, the oxide and the ferrovanadium. The court admitted evidence over the objection of the appellants, of their net profits from the sale of vanadium oxide and ferrovanadium. And, the jury was permitted to determine damages on the basis of the profit spread between the cost of the vanadium ore and the price of oxide and ferrovanadium.

■■■ Loss of profits has been accepted as constituting an element of recoverable damages where they are capable of being measured or estimated on a reasonable basis. See Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp., 8 Cir., 194 F.2d 846; Atlas Building Products Co. v. Diamond Block & Gravel Co., 10 Cir., 269 F.2d 950; Bigelow v. R. K. O. Radio Pictures, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652. It would seem reasonable to say that profits from sales of a finished product in a monopolistic market are distinctly relevant to the free market value of the raw materials, the cost of which was a constituent element of such profits. This is especially so when considered in the context of an integrated industry. It seems relevant to consider that from 1934 to 1947, ferrovanadium was sold in a controlled and restricted market for $2.70, $2.80 and $2.90 per pound, depending on grade. And, there was some evidence to the effect that based upon the price paid for vanadium ore, and the cost of conversion into the finished product, the appellants could have profitably paid as much as 80¢ per pound for the $V_2O_5$ contained in the ore purchased from the plaintiff-miners. This data was based upon calculations which, while attacked,

cannot be said to be wholly without factual basis. In these circumstances, we cannot say that the jury's finding to the effect that the free market price of 2 percent vanadium ore for the period October 1938 through March 1948 was 40¢ per pound instead of 31¢ was clearly erroneous.

## DAMAGES FOR THE URANIUM CONTENT OF THE ORE.

As we know, appellees claimed damages for uranium sales made to the appellants from 1938 to the advent of the Atomic Energy Commission in April 1948. The jury awarded no damages for sales made prior to January 1, 1943. The appellants first deny the existence of any conspiracy or monopolistic designs with respect to the purchases of uranium ore. The appellees take the position that the conspiracy alleged, and which the jury found, related to and affected the purchase of carnotite ore on the Colorado Plateau which, as we know, contained both uranium and vanadium on a ratio of about six parts vanadium to one part uranium; and that from the very beginning, appellants conspired not to pay the miners anything for the uranium content in the ore, while recognizing its value and while selling it to the government.

A bit of background is important to a consideration of our question. As we have seen, at the beginning of the mining operations on the Colorado Plateau, the uranium content of the carnotite ore was considered a valueless impurity, relegated to refuse in the form of tailings. The splitting of the atom in 1939, and the publication in 1940 of literature on the potential value of uranium as a fissionable material, fired the imagination of some scientists and industrialists, including some of the officers and employees of Union Carbide. As early as 1939, USV constructed a small recovery plant in connection with its Uravan operations. High grade uranium sludge was recovered from the tailings. About the same time, Union Carbide, through one of its subsidiaries, began experimenting with

uranium as a source of energy, and in 1940, USV sold and delivered 1,000 pounds of uranium sludge to another subsidiary for experimental purposes. But, these experiments did not result in the production of uranium oxide for commercial purposes, and as far as we can determine from the record, no commercial use was made of it.

The so-called Manhattan District was formed in 1942 by the government for the specific purpose of secretly developing and producing the atomic bomb. In the latter part of 1942 or the first part of 1943, Manhattan entered into classified "cost-plus-a-fixed-fee" contracts with USV for the construction and operation of two "sludge plants," one at Uravan, Colorado, and another at Durango; and a refining plant at Grand Junction. The sludge plants were designed to manufacture uranium sludge or slime (designated by a secret code) from sand tailings which had accumulated from the operation of the vanadium mills at the same sites. The Grand Junction plant was designed to refine the sludge into uranium oxide, also designated by a secret code. Contemporaneously with these construction and operation contracts, the government contracted with USV to purchase the refined oxide from USV and the sludge from VCA. About the same time, the government-owned plant at Monticello was activated for the processing of uranium sludge under a contract between Manhattan and MRC.[6] About the same time, the government commissioned a subsidiary of Union Carbide called Union Mines, to develop processes for the benefication of uranium and to survey the resources of uranium on the Colorado Plateau, and make recommendations "for the acquisition of the strongest possible control of the products and disposal of such resources." Also in the early part of 1943, Manhattan enlarged VCA's Tandawanda ceramic plant, which had been used to process high grade uranium for the ceramics industry. Throughout the period of the so-called Manhattan project, this plant continued to be known as a ceramic plant for security reasons. All of these contracts contained the legally required provision against disclosure of any information relating to the contracted work under penalty of law. These contracts remained secret and classified until unclassified in 1957. None of these contracts contemplated a profit to the appellants for any of the work done or performed, or for the products processed and delivered.[7] Most, if not all, of the high grade uranium sludge came from the workings of tailings which had accumulated from the vanadium operations, during which the uranium content in the ore was valueless. Notwithstanding all these activities, only 12½ percent of the uranium utilized in the Manhattan project came from the Colorado Plateau. Throughout the period of development of the atomic bomb, and until the dropping of the first bomb in 1945, Manhattan looked primarily to high grade uranium ores from the Belgian Congo for its source of fissionable material. The production of uranium on the Colorado Plateau was considered only as a by-product of the vanadium ore operations. There was no concentrated effort toward the exploitation of the uranium content in the carnotite ore until the advent of the

6. As far as we can determine from the record, VCA had no facilities for the refining of the sludge to oxide, but sold the sludge to the government for processing and refining in government-owned plants at Tandawanda and Monticello, or at the USV plant at Grand Junction.

7. The first contract between the government and VCA dated November 1942 for the purchase of sludge, provided for the payment of 55¢ per pound for $V_2O_5$ and 75¢ for $U_3O_8$. Subsequent contracts in 1943 with amendments provided for the payment of 90¢ per pound for $V_2O_5$ and $1.10 for 30 percent $U_3O_8$. This price was later revised to $1.40, with the price of $V_2O_5$ remaining the same. Other contemporaneous contracts provided for the purchase of tailings from VCA at the Naturita plant for 25¢ per pound for contained $U_3O_8$ and 25¢ for $V_2O_5$. Similar contracts were entered into with USV.

Atomic Energy Commission in 1947.[8] Indeed, appellees accuse. the appellants of concertedly subordinating the production and marketing of the uranium content in the ore to the conspiratorial agreement to fix the price and control ;the market of vanadium products.

With the dropping of the bomb and the ending of the war in 1945, the demand for uranium as fissionable material began to phase out. Having developed the bomb which ended the war, the mission of the Manhattan District was accomplished. While the government apparently continued to honor its existing uranium contracts with appellants after 1945, there was no urgent need or market for uranium. Matters drifted along until Manhattan went out of existence at the end of 1946 and the Atomic Energy Commission took over in January 1947. There' has never been a free market for $U_3O_8$ as fissionable material. The government is and always has been the sole and only purchaser at prices fixed or negotiated with the suppliers.

Viewed in this perspective, it seems doubtful whether the pre-existing vanadium monopoly was broad enough to embrace an agreement not to pay the plaintiff-miners for the uranium content of the carnotite ore purchased by the appellants during the period in which the government was purchasing uranium sludge processed from accumulated tailings at the vanadium mill sites. We will, however, resolve all doubts in favor of the findings which are implicit in the jury .verdict, and assume the existence of a conspiracy to monopolize or attempt to monopolize the market for the uranium content of the carnotite ore, which is the subject matter of this suit. But even so, we are unable to discern how the appellees can be said to have suffered any compensable harm as a result of the activities of the appellants in connection with either the MRC vanadium ore-purchasing program, or the Manhattan-uranium project. The USV-MRC contract of May 9, 1942, authorizing USV to purchase ore suitable for treatment in government-owned plants at reasonable prices not to exceed 50¢ per pound for vanadium oxide, did not authorize USV to pay anything for the uranium content of the ore. Indeed, there is nothing in the record to indicate that the government's vanadium ore-buying program contemplated the payment for or the recovery of the uranium content of the ore purchased under. the USV-MRC contracts.[9] With the advent of the uranium-

8. On December 7, 1948, Dr. Gustafson, Manager of raw materials operations of the AEC, issued a statement of policy in 'which he said in part: "Following the' war it was tenatively decided by the Manhattan District to purchase only by-product uranium rather than to stimulate and support increased production by special incentives. This position was based on the fact that the ' known uranium reserves of the Colorado Plateau were limited and expensive to mine and produce and that the only advantage of an accelerated program would be to make this limited supply available sooner. Since the estimated annual production of the Colorado Plateau, even under an accelerated program, would be small in relation to total U. S. requirements and to supplies available from foreign sources, it appeared more economical to obtain the uranium as a by-product from vanadium operations which were geared to the vanadium market. * * * The decision to undertake a rather extensive development and production program on the Colorado Plateau was based on a number of considerations: the use and conservation of idle facilities; the conversion of underground ore reserves into immediately available finished product; and, as part of our over-all uranium program, the development of a domestic uranium mining industry adequately staffed with experienced technical and management personnel, which could be rapidly expanded in time of an emergency."

9. In November 1942, the Vice President and General Manager of MRC purchasing program wrote to a miner as follows: "Since the uranium content of these ores is not recovered, at the present time, in the plants in operation for Metals Reserve Company's account, no payment is made for uranium content."

The record shows that in 1943, the Manhattan District contracted with MRC to process and deliver uranium sludge

purchasing program in 1943, the appellants, and for that matter everyone else, was forbidden under penalty of law to acknowledge that the uranium content in the ore was being saved or utilized. It is agreed that the Manhattan project for the acquisition of uranium ore on the Colorado Plateau was a security secret. It may well be that a portion of the vanadium content of the miners' ore found its way into the sludge which the appellants sold to Manhattan under the contracts, but even so, the contracts did not contemplate a profit to the appellants, and the record shows that operating profit, if any, was negligible.

In these circumstances, we can find no factual basis for the award of damages based upon ore purchases prior to the dropping of the atomic bomb in July 1945. But appellees assert that there was no reason for secrecy after July 1945, and therefore no valid grounds for not compensating the appellees for the uranium content of ore purchases after that date. Subsequent to the dropping of the bomb, and in 1946 and 1947, the government entered into contracts with the appellants for the purchase of $U_3O_8$ in the form of sludge and sodium uranate, highly refined uranium products. While these contracts were coded and classified, they explicitly provided for the payment of the $U_3O_8$ contained in the ore, "wheth-

er such ore is produced or mined by the contractor or purchased from an outside source." These contracts, as revised and amended, are irrefutable evidence of the amount of uranium contracted to be sold to the government during the years 1945, 1946 and 1947, and the unit price to be paid therefor.[10] In January 1946, USV issued a price schedule providing for the payment for uranium at 30¢ for .75 percent uranium ore. VCA issued its first price schedule in the spring of 1947 for 50¢ per pound for similar ore.

Giving full effect to the combination and conspiracy as it embraced the uranium content of the ore purchases, we are brought to the point of confining the compensable damages to purchases of the $U_3O_8$ content of the carnotite ore which are traceable to the $U_3O_8$ contracted sales to the government in 1946 and 1947 based upon the per unit price of such sales.[11]

This brings us to the matter of attributable damages for private vanadium ore purchases by the appellants from the appellees subsequent to April 1, 1948. Again we can find no rational basis for finding that the plaintiffs suffered any damages resulting from the existence of a conspiracy during that period. In that connection, we may assume that the conscious parallelism in the pricing and marketing structure of the vanadium indus-

from tailings at the government-owned Monticello plant at the same prices being paid to the appellees under similar contracts. But, there is nothing in the record to indicate that as operator of the plant, VCA in any wise profited by this operation.

10. In 1945, USV sold to the government uranium oxide with a value of $216,116.00, at an average unit sales price of $.324; in 1946 it sold uranium oxide to the government with a value of $2,174.00 at an average unit sales price of $.300; in 1947 it sold the government yellow cake containing uranium in the value of $734,370.00 at an average unit sales price of $9.000.

In 1945, VCA sold the government uranium sludge with a total value of $176,208.00 at an average per unit sales price of approximately $1.50; in 1946 it sold $61,175.00 worth of uranium sludge

for about the same unit price; in 1947 it sold sodium uranate to the government for the gross price of $254,170.00, at $4.705 per unit.

11. The record does not clearly indicate the method or formula employed by the jury to identify and calculate the miners' share of the tailings from which uranium sludge was processed and sold to the government during the Manhattan project. Neither the briefs nor the record enlighten us on this point beyond the statement that the damages awarded to the individual miners are based upon their respective vanadium ore settlement sheets and determinable on the ratio of one part uranium to six parts vanadium; and that 10 percent of the ore milled at Uravan by USV was purchased ore, and 30 percent of the ore milled by VCA at Naturita was purchased ore.

try, as shown by the record, was sufficient to sustain the burden of proving the continued existence of the combination and conspiracy beyond the advent of the Atomic Energy Commission. See Morton Salt Co. v. United States, 10 Cir., 235 F.2d 573.

■ It is important to remember that there was a surplus of vanadium in 1944 when the government discontinued its MRC ore-buying program, and that when in 1947, uranium became the prize element in the carnotite ore and the government entered into contracts with the appellants for the purchase of sludge and other high grade uranium products, it became necessary to make arrangements for the disposition of the vanadium content. This resulted in the purchase and stockpiling of vanadium on an established ratio. The mounting surplus of vanadium from the urgent quest for uranium and the apparent necessity for keeping it off the market, led the Atomic Energy Commission in April 1948 to promulgate minimum established prices for uranium-bearing carnotite or rosceolite ore. Atomic Energy Commission Circular 3, which fixed the price of uranium, also fixed the minimum price of vanadium at $31\cancel{c}$ per pound, not exceeding 10 pounds of $V_2O_5$ for each pound of $U_3O_8$. Twenty-three different companies on the Colorado Plateau became engaged in the operation of uranium processing plants, most of which were larger than the appellants' two plants. None of these companies paid more than the established minimum price for vanadium, and in turn sold the same to the A. E. C., which stockpiled it and unsuccessfully offered to sell it below the prevailing price. Although appellants continued to control the ferrovanadium market and to fix the prices, it was utterly impossible for them to have controlled or fixed the price of vanadium ore. The government price was a support price. Several processors refused to pay for the vanadium at all. We are thus brought to the conclusion that the judgment of the trial court based upon ore purchases subsequent to April 11, 1948 is factually unsupportable.

## CLAIMED ERRORS IN THE INSTRUCTIONS

■ The appellants complain of the refusal of the court to instruct the jury on the "relevant market," "thrust upon monopoly," "refusals to deal," and instructions on price uniformity and attempts to monopolize. They particularly complain of the court's refusal to give nineteen requested instructions after indicating its intention to do so. Appellees claim that the appellants failed to properly save their objections to the court's instructions in accordance with Rule 51 F.R.C.P. But the appellants submitted more than fifty requested instructions, many of them revised requested instructions, and all intended to present to the court appellants' theory on the various crucial points in the lawsuit. They objected to the refusal of the court to instruct the jury as requested in a manner to bring to the attention of the court the various objections and the grounds therefor. The court was fully informed of the appellants' theory of the case and the requirements of the Rule were fulfilled. See Downie v. Powers, 10 Cir., 193 F.2d 760; cf. Western Machinery Co. v. Consolidated Uranium Mines, 10 Cir., 247 F.2d 685; Hayes v. United States, 10 Cir., 238 F.2d 318; Pridgin et al. v. Wilkinson et al., (10 CA—Sept. 1961) 296 F.2d 74.

Particularly, the appellants requested the court to instruct the jury that in determining whether the appellants attempted to exercise or did in fact exercise unlawful monopoly powers, they must take into consideration the relevant market for the products involved; that relevant market was composed of products with reasonable interchangeability for the purpose for which they were produced—"price, use and quantities considered;" and that if the jury found that vanadium oxide and ferrovanadium had no independent market, but were interchangeably used in connection with or in competition with other ferro alloys, they could not find that the appellants agreed to monopolize, or either of them monopolized or attempted to monopolize

in violation of the antitrust laws. In support of this requested instruction, reference is made to United States v. E. I. Du Pont De Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264. See also International Boxing Club of N. Y. v. United States, 358 U.S. 242, 243, 79 S.Ct. 245, 3 L.Ed.2d 270; United States v. Yellow Cab Co., 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010; Cole v. Hughes Tool Co., 10 Cir., 215 F.2d 924.

■■■ There was some evidence that ferrovanadium was sold in the ferro alloy market in competition with other alloys. And, commodities which are "reasonably interchangeable by consumers for the same purposes make up that 'part of trade or commerce', monopolization of which may be illegal." See Du Pont, 351 U.S. p. 395, 76 S.Ct. p. 1007, quoted in International Boxing Club. But, Section 1 of the Sherman Act condemns unreasonable restraints irrespective of the amount of trade or commerce involved; and Section 2 condemns a monopoly or attempts to monopolize—either in concert or individually—"any part of the trade or commerce." See United States v. Paramount Pictures, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260, also quoted in International Boxing Club. We do not understand the Du Pont case to hold that every commodity which is reasonably interchangeable with another commodity cannot be the subject of a Section 2 illegal monopolization, for, "industrial activities cannot be confined to trim categories. Illegal monopolies under § 2 may well exist over limited products in narrow fields where competition is limited." Du Pont, 351 U.S. p. 395, 76 S.Ct. p. 1007. In our case, the mining, processing and marketing of the finished products from vanadium ore were undoubtedly an integrated industry forming a definitive part of trade and commerce, and it was undoubtedly the subject of monopolization without relationship to other competitive products. Moreover, the gist of the claim here is not the monopolization of the finished product, ferrovanadium, but rather of the raw materials from which it was made. The mining and

marketing of the raw materials were undoubtedly an "appreciable part of interstate commerce" and as such subject to a Section 2 monopolization. United States v. Yellow Cab Co., supra.

■■■ Nor do we agree that the trial court erroneously refused to instruct on the theory of "thrust upon" monopoly. There is nothing here to indicate or from which it can be fairly inferred that the found monopoly in vanadium was "thrust upon" the appellants or either of them by the "forces of nature" or industrialized attrition. See Swift & Co. v. United States, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518, quoted in United States v. Griffith, 334 U.S. 100, 105, 68 S.Ct. 941, 92 L.Ed. 1236. And see also United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416.

On the issue of monopoly and attempts to monopolize, the trial court instructed the jury in substance that it was unreasonable per se to foreclose competitors from any substantial market; that the use of a monopoly power, however lawfully acquired, to foreclose competition, obtain a competitive advantage, or to destroy a competitor, is unlawful under Section 2. And see United States v. Griffith, supra, 334 U.S. p. 107, 68 S. Ct. 941. The court was careful to draw a distinction between a conspiracy to monopolize under Section 1 and a monopolization or attempts to monopolize under Section 2. It defined a Section 2 monopoly as "the attainment of such position of [market] power in an industry so as to be able to exclude others from competition or fix prices." And, it went on to tell the jury that the attainment of such market power by a single corporation, coupled with showing of employment of methods, means and practices, which are in themselves in restraint of trade, constitutes a violation of Section 2. And see American Tobacco Co. v. United States, 328 U.S. 781, 785, 66 S.Ct. 1125, 90 L.Ed. 1575; Kansas City Star v. United States, 8 Cir., 240 F.2d 643. And, the court went on to say that Section 2 condemns attempts to monopolize if accom-

panied by a specific intent to exclude others from competition or to fix prices.

 The appellants complain of the refusal of the court to tell the jury that the specific intent must be accompanied by conduct sufficient to create "a dangerous probability of monopolization." The trial court instructed the jury to the effect that before they could find for the plaintiffs, they must be satisfied by the greater weight of the evidence that the defendants agreed to restrain trade in vanadium products, or that they monopolized or attempted to monopolize, either in concert or individually; and that such unlawful conduct had an injurious impact on the plaintiffs' businesses. We think the instructions in that regard correctly stated the law of the case, and we do not think it was reversibly erroneous to refuse to define "attempt to monopolize" beyond the point of telling the jury that the attempt must be accompanied by a specific intent to acquire market power and exclude others from competition. Having thus correctly instructed the jury, appellants cannot complain of the refusal of the court to give their requested instructions, even though they may have been literally correct statements. See Loew's, Inc. v. Cinema Amusements, 10 Cir., 210 F.2d 86; Tyler v. Dowell, Inc., 10 Cir., 274 F.2d 890; Telluride Power Co. v. Williams, 10 Cir., 164 F.2d 685.

 The appellants complain generally of the instructions as being weighted in favor of the appellees and against the appellants. They earnestly contend that rulings in the course of the trial, together with his instructions, so influenced the jury so as to deprive them of a fair trial. There are, to be sure, instances in the record in which the trial court indicated with some emphasis his view of the evidence, and even a critical attitude toward counsel for appellants. And, it may be fairly said from the tenor of the whole record that the jury was impressed with the views of the court concerning the merit of the plaintiffs' case, and the demerits of the defendants'

case. But, as we have recently said, "a judge presiding over a * * * federal court is not a mere umpire. He has both the responsibility of assuring the proper conduct of the trial and the power to bring out the facts of the case." Jordan v. United States (10 CA—Sept.1961), 295 F.2d 355. To that end, an expression of the court's views with respect to the evidence and conduct of counsel within proper limits is permissible, provided the jury is given to understand that they are free to form their own opinion of the facts and apply them to the law. See Tyler v. Dowell, Inc., supra. At the beginning and ending of the court's instructions, the jury was told that they were the sole judges of the facts and of the credibility of witnesses having testified to facts, and that it was for them to determine who they would believe and where the ultimate truth lies; and that if, in the course of the trial or during the instructions, the court had said anything indicating its view of the testimony, and the jury entertained a different view, they should follow their own opinion rather than the court's. The jury was emphatically told that it was for them to resolve all conflicts in the evidence, and that they should consider the evidence as a whole "carefully, impartially, without any bias or prejudice of any kind, way, shape, manner or form, one way or the other." In these circumstances, we do not think the trial court exceeded the limits of his prerogatives as the governor of the trial.

The appellants also complain of the admission and exclusion of evidence. But we do not think the court's rulings in that regard prejudicially affected the outcome of the litigation. See Rule 61 F.R.Civ.P.; Blum v. Cottrell, 4 Cir., 276 F.2d 689.

 The appellants complain of the inclusion, as a part of the costs awarded to the plaintiffs, the sum of $9,915.63 for accounting fees for services performed by an accounting firm for the plaintiffs in connection with the prosecution of the case. These fees are not properly allowable. See Euler v. Waller, etc. (10

CA—Sept.1961) 295 F.2d 765, construing Rule 54(d) F.R.Civ.P.

■ The appellants also complain of the allowance of $500,000.00 attorney fees as erroneously excessive. Inasmuch as in our view the trial court's judgments must be vacated and modified, we have given consideration to the allowance of attorneys fees in the light of the outcome of the litigation here, commensurate with the judgments to be entered. We are of the considered opinion that an allowance of 15 percent of the amount recovered, together with the allowable costs, would be reasonable.

■ The several judgments are vacated and the cases remanded for the entry of judgments in favor of the respective appellees: (1) for the difference between the amounts paid and 40¢ per pound $V_2O_5$ for the vanadium content of the private ore purchases by the appellants from the appellees from 1938 to 1948; (2) for separate judgments in favor of the appellees for the difference between the prices paid to the appellees and 50¢ per pound $V_2O_5$ for ore purchases by USV as agent for MRC; and (3) separate judgments in favor of the appellees for the value of the uranium content of ore purchases from them, which is identifiable in the uranium sales in any form by the appellants to the government subsequent to September 1, 1945, based upon unit prices received by the appellants from the government, in accordance with the several contracts of record.

## COUNT TWO OF THE BALSLEY CASE.

As we have seen, the jury returned separate verdicts in this case—one in favor of the thirty-six plaintiffs named in the first count, and another for the class of approximately three hundred fifty unnamed plaintiffs. The latter verdict was in response to special interrogatories, which submitted to the jury (1) the question whether defendants violated the antitrust laws; (2) whether such violations resulted in damage to the members of the class; and (3) the amount of per-pound damages which the respective members of the class would have received for their ore, during the specified period, but for the violations.[12]

Pursuant to the verdict, the court entered an order giving the unnamed miners six months to appear and file claims before a special master who will deter-

12. The form of verdict submitted to the jury by the court and the per-pound damages found by the jury in the bracketed portions, is as follows:

"WE, THE JURY IMPANELED IN THE ABOVE ENTITLED ACTION, FIND THAT:

1. The defendants did violate the antitrust laws.

2. The violations did have an injurious impact on that class of persons identified as those who mined and sold, either as lessors or lessees, vanadium-uranium ore to the defendants on the Colorado Plateau.

3. But for the violations of the antitrust laws this class would have received the following amounts per pound to cover the vanadium and uranium content of the vanadim-uranium ore based on 2% $V_2O_5$.

### VANADIUM

(a) For the period October 10, 1938 to March 1948 $[ .40] per pound.
(b) For the period April 1, 1948 to May 28, 1958 $[ .35] per pound.
(c) For the period June 1, 1942 to February 1944, as to sales to UNITED STATES VANADIUM as Agent for METALS RESERVE CORPORATION (MRC) $[ .50] per pound.

### URANIUM

(a) For the period January 1, 1939 to December 31, 1942 $[none] per pound.
(b) For the period January 1, 1943 to August 31, 1945 $[1.25] per pound.
(c) For the period September 1, 1945 to March 31, 1948 $[2.50] per pound.

4. The approximate average ratio of vanadium to uranium for vanadium-uranium properties on the Colorado Plateau is [6] to 1."

mine the extent, if any, of each miner's damages, in accordance with the per-pound formulae provided in the verdict. The court also ordered the defendants to produce their ore settlement sheets identifying the members of the class and the amount of ore purchased from each. The final judgments, as to each member of the class, are to be based upon the prescribed per-pound formulae and in accordance with the respective ore settlement sheets.

It is appellants' contention that the procedure adopted by the trial court erroneously authorizes intervention by the unnamed plaintiffs after rendition of a favorable verdict. And we are thus squarely brought to an unresolved question of procedural law, i. e., whether in a class action under Rule 23(a) (3), F.R. Civ.P., non-participating plaintiffs may intervene after determination of defendants' liability, to share in the fruits of a judgment obtained by their participating representatives.

One line of authority is to the effect that a 23(a) (3) class action is merely another joinder device, placed in the Federal Rules in order to obviate the jurisdictional requirements of complete diversity "where there are numerous persons who have claims or defenses that involve a common question of law or fact." 3 Moore § 23.10(3), p. 3448. See e. g. Kainz v. Anheuser-Busch, Inc., 7 Cir., 194 F.2d 737, 743; Central Mexico Light & Power Co. v. Munch, 2 Cir., 116 F.2d 85; Independence Shares Corp. v. Deckert, 3 Cir., 108 F.2d 51, 55; California Apparel Creators v. Wieder, 2 Cir., 162 F.2d 893, 174 A.L.R. 481; 3 Moore § 23.-10; 2 Barron & Holtzoff, Federal Practice and Procedure, §§ 562, 569. From this it has been reasoned that 23(a) (3) serves only this one purpose and, conse-

quently, only those persons who are actually parties to the litigation are bound by or can share in a money judgment.[13] See e. g., Weeks v. Bareco Oil Co., 7 Cir., 125 F.2d 84, 91; Oppenheimer v. F. J. Young & Co., 2 Cir., 144 F.2d 387; 3 Moore § 23.11(3); 2 Barron & Holtzoff, Federal Practice and Procedure, § 572; and that any other use of the rule would violate the precepts of mutuality of estoppel which may have constitutional overtones. I. e. see Hansberry v. Lee., 311 U.S. 32, 43, 61 S.Ct. 115, 85 L.Ed. 22; 3 Moore § 23.11(5).

Other courts, in cases where there has been an identifiable class, have allowed unnamed plaintiffs to intervene and share in the judgment obtained by their representatives, insofar as each is able to prove both membership in the class and damages. See York v. Guaranty Trust Co., 2 Cir., 143 F.2d 503, 529, reversed on other grounds, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079; Pentland v. Dravo Corp., 3 Cir., 152 F.2d 851, 856; Bascom Launder Corp. v. Telecoin Corp., 2 Cir., 204 F.2d 331, 336; Nagler v. Admiral Corp., 2 Cir., 248 F.2d 319, 327; All American Airways v. Elderd, 2 Cir., 209 F.2d 247; Speed v. Transamerica Corp., D.C., 100 F.Supp. 461, 463; Tolliver v. Cudahy Packing Co., D.C., 39 F.Supp. 337, 339; Alabama Independent Service Station Ass'n v. Shell Petroleum Corp., D.C., 28 F.Supp. 386; Hormel v. United States, D.C., 17 F.R.D. 303; State Wholesale Grocers v. Great A. & P. Tea Co., D.C., 24 F.R.D. 510, 512–513. See also Kalven & Rosenfield, the Contemporary Function of the Class Suit, 8 U.Chi.L.Rev. 634; Comment, The Spurious Class Suit; Procedural and Practical Problems Confronting Court and Counsel, 53 NW. U.L.Rev., 627, 630–633; Keeffe, Levy & Donovan, Lee De-

13. It is interesting to note that Professor James W. Moore, a distinguished member of the original Rules Committee, apparently proposed that the Committee adopt a provision to the effect that a judgment in a 23(a) (3) class action be " * * * conclusive upon only the parties and privies to the proceedings." The Committee did not accept this proposi-

tion and it seems to have formed the basis for Professor Moore's reasoning in his monumental treatise, which has had an obvious influence upon the courts. See 6 Stanford Law Review 120, 137–141, and the authorities cited. Also see Moore & Cohn, Federal Class Actions—Jurisdiction and Effect of Judgment, 32 Ill. Law Rev. 555, 563; 3 Moore p. 3472.

feats Ben Hur, 33 Corn.L.Q. 327; Comment, 46 Col.L.Rev. 818.

Undoubtedly this latter solution results in the more expeditious and efficient disposition of litigation and ought therefore to be favored. If, on the other hand, this type of class action was intended to have as its only function an adjunctive method of permissive joinder, there would be no logical reason for its being made a part of Rule 23 instead of another means of joinder under Rule 20. It is of no avail to say that 23(a)(3) is merely meant to obviate the requirements of complete diversity and thereby allow joinder by non-diverse parties in cases where there are numerous members of the class. See 3 Moore § 23.10(3), p. 3448. It is, of course, true that the Rule does serve this function; however, we envisage it as having a broader purpose—to allow a final determination of common questions of law and fact. Otherwise 23(a)(3) is relegated to an out-of-context incongruity amongst the utilitarian procedural modes which, when brought together, elucidate the modern-day concepts of class actions. We would thus be brought to the point of saying, " \* \* \* that where it is impracticable to bring all the parties before the court they must nevertheless be brought before the court." Kalven & Rosenfield, supra, p. 700. This result would be manifestly inconsistent with the broad purposes of the Rules.

■ It is likewise sophistic to argue that mutuality of estoppel operates to prevent the unnamed miners from intervening after rendition of the verdict. For one is not precluded from claiming the benefits of a favorable judgment to which he was not a named party, simply because he would not have been bound by an unfavorable judgment rendered against named parties who did not adequately represent his interests. Hansberry v. Lee, supra, 311 U.S. p. 43, 61 S.Ct. 115. But, even so, whether these plaintiffs would have been bound by an unfavorable judgment is not decisive. The critical fact is that the court has yet to enter the final judgments, and mutuality of estoppel is therefore inapposite. Before any final judgment is rendered, all unnamed claimants will be present and required to prove their identity with the class who were damaged by force of defendants' unlawful acts. Defendants' liability and the extent thereof has been competently proven by the named plaintiffs and it would be grossly redundant to say that it must be proven again by the unnamed members of the represented class. See 71 Harv.Law Rev. 934–939.

■ Nor does submission to a special master violate defendants' right to a single, indivisible jury trial. All operative facts have been determined in the original action. The master serves only to assess the amount of individual damages, based upon the formulae stated in the verdict and appellants' own records. And see Rule 49(a) F.R.Civ.P. If, in the process of identifying the members of the class and assessing the amount of their respective damages, unresolved questions of fact are disclosed, it is time enough to submit those questions to a jury, duly empaneled for that purpose. The interlocutory order of the court does not contemplate the denial of the right to a jury trial on any unlitigated question of liability.

■ The defendants make the further argument that the statute of limitations has run as to those miners who were not parties actually before the court. In order to reach this conclusion, they contend that the filing of the original action serves to toll the statute only in favor of those present; and that each class member must "appear and assert his claim" before expiration of the statutory period. See also Athas v. Day, D.C., 161 F.Supp. 916; 3 Moore § 23.10, p. 3443. If, however, the unnamed plaintiffs are to be accorded the benefits of the judgment, it must be said that the running of the statute of limitations is tolled by the commencement of the suit. See also Joint Council, etc. v. Delaware, L. & W. R. Co., 2 Cir., 157 F.2d 417, 421; Lynch v. American Motorists, D.C., 101 F.Supp. 946; 3 Moore § 23.12, p. 3476.

If a class action is maintainable as such, it is incongruous to say that the absent members, who are represented by those present, may not rely upon the commencement of the action by their brethren to toll the running of the statute. This would only serve to "convert the rule into a trap" for those who have expeditiously allowed their rights to be maintained by a class action. York v. Guaranty Trust Co., supra. See also Richmond v. Irons, 121 U.S. 27, 52–53, 7 S.Ct. 788, 30 L.Ed. 864; Deckert v. Independence Shares Corp., D.C., 39 F.Supp. 592.

The appellants' final contentions in this action attack the questions propounded by the form of verdict and the propriety of the court's order. Suffice it to say that the action was ripe for submission on special interrogatories, and the questions posed by the court cannot be deemed "clearly erroneous" or a breach of discretion. The attacked order merely contemplates the submission of a plan for consideration by the court. Until this plan has become a part of a judgment or other final order, any question concerning it is academic. Of course any orders of submission and judgments rendered must be in conformity with the judgments to be entered for the named plaintiffs, in accordance with the views herein expressed.

## No. 6319
## UNION CARBIDE AND CARBON CORPORATION and VANADIUM CORPORATION OF AMERICA.
### vs.
### FRANK NISLEY, JR., ET AL.

 As indicated in the forepart of the Balsley opinion, supra, this appeal is from a judgment against the same appellants in favor of ore mill men on the Colorado Plateau, who claimed to have suffered the loss of their ore milling business as the result of the monopolistic activities described in the Balsley case. We start with a factually established combination and conspiracy to monopolize the source, fix the price, and control the market for vanadium ore and its products, as in Balsley. Our inquiry then is confined to the sufficiency of the evidence to support a jury finding that the appellees, Nisley and Wilson, were damaged in their business by the appellants' predatory practices, and if so, whether to the extent of the jury's verdict, i. e., $40,000.00 tripled to the sum of $120,000.00 We must bear in mind that it was incumbent upon the appellees to prove that they suffered damages as a proximate result of the conspiracy or monopoly with reasonable certainty. But, having thus established the factum of damages, the amount thereof may be fairly approximated by the jury. See Atlas Building Products Co. v. Diamond Block & Gravel Co., 10 Cir., 269 F.2d 950; Telluride Power Co. v. Williams, 10 Cir., 164 F.2d 685, 686. And, we must also remember that the jury, not the court, is the trier of the facts in these cases, and if the evidence, viewed in its most favorable light, justifies the crucial inferences the jury has drawn from those facts, we are not to disturb them even though as a fact finder we would have drawn a different inference or conclusion. See Atlas Building Products Co. v. Diamond Block & Gravel Co., supra, and cases cited. Some contextual facts are necessary to an understanding of our precise problem.

With the up-turn of the market for vanadium products in 1938 and 1939, due to defense requirements, several small oxide ore mills began operation on the Plateau. One of them was the Gateway Alloys Mill, located at the foot of a mountain containing rich deposits of carnotite ore. The ore claims belonged to another party, but were leased or let to Gateway for so many "cents per pound for vanadium mined." The mill commenced operations in 1938, but due to mismanagement or uneconomical operations, was closed in 1940. About the same time the manager for Gateway made arrangements with USV to take over the operation of the mines. During the next year, USV constructed a road on the other side of the mountain from the Gateway plant, stripped 12,000 or

15,000 pounds of surface ore from the claims, and hauled it about 65 miles to its plant at Uravan. On July 1, 1941, USV turned the leases back to Gateway Alloys, Inc.

Meanwhile, and in March 1941, the appellees Nisley and Wilson formed a partnership to reopen and operate the Gateway mill under a lease from the original owner. Operations commenced in June 1941 on a ten-ton per day ore schedule. The mill was capable of producing only an intermediate product called "red cake," the first shipment of which was sold to USV. A dispute arose concerning the assay, and no further sales were made. The mill was closed until an arrangement was made with the Continental Ore Company to purchase the mill's entire oxide output for $1.03 per pound, f. o. b. Grand Junction. The price was later raised to $1.15 per pound. Modifications were effected to enable the mill to process black vanadium oxide, all of which was delivered by directions of Continental to the Apex Mining Company in Chicago for processing into ferro-vanadium.[14] Apparently Apex's ferro-vanadium operations were not profitable or satisfactory. In any event, in the early part of 1942, Apex approached VCA, offering to sell its ore stock and equipment to VCA. The transaction was eventually consummated and Apex went out of the ferro-vanadium business. Nisley-Wilson thereupon lost its oxide customer and appellants lost a ferro-vanadium competitor. About the same time and in May 1942, MRC commenced its ore-buying program through USV. The base price of vanadium ore was raised from 21¢ to 31¢; Nisley-Wilson was unable to compete and mill operations were discontinued. In October 1942, Nisley and Wilson negotiated a contract with the War Production Board to process ore supplied to them by USV as agent for MRC for a stipulated price per oxide pound. While this Toll Agreement was reached in October 1942, operations did not commence until April 1943. By this time it was necessary for the partnership to negotiate a loan to install new equipment and enlarge their facilities. The mill operated under the Toll Agreement from April 1943 until January 1944, when the agreement was terminated by MRC. By this time the war-time demand for vanadium had been satisfied, and as we have seen from Balsley, there was a surplus of vanadium. The mill was closed with a six-months stockpile of ore, which was later moved to the USV plant at Uravan. Production at the Gateway mill was never resumed, and the venture failed.

The precise claim is to the effect that from the very outset, the appellants conspired and combined to monopolize all ore claims capable of supporting competitive mills and thus made it unprofitable for any independent mill to operate on the Plateau; that they combined to foreclose the appellees from a market for their oxide; that USV, as agent for MRC, deliberately and designedly delayed and forestalled the consummation of the Toll Agreement and the commencement of operations under it until the appellees were in dire circumstances, and then precipitously terminated the contract in order to prevent them from getting a foothold in the vanadium business. The further contention is that, after the termination of the Toll Agreement, the appellees were excluded from the uranium business, all of which resulted in complete loss of the business enterprise, with consequent loss of profits during the period of operation and prospective profits, but for the failure.

In our view of the evidence, the jury might very well have concluded that the failure of the venture was due to underfinancing, mismanagement or uneconomical operation, all factors over which neither the appellants nor either of them exercised any conscious control. But there was evidence which the jury apparently credited, to the effect that the ap-

14. For more detailed facts concerning this arrangement, see Continental Ore Co. v. Union Carbide & Carbon Corp., 9 Cir.,

289 F.2d 86, cert. granted, 368 U.S. 886, 82 S.Ct. 141, 7 L.Ed.2d 87.

pellants set out to acquire all of the vanadium ore claims on the Colorado Plateau which were capable of supporting an independent milling venture, i. e., to discourage the independent millers "in any way we could." There was evidence to the effect that USV stripped the cheap ore from the mines tributary to the Gateway mill and hauled it out 65 miles over a road away from the mill, not because they needed the ore, but because USV "wanted to keep another vanadium operation from getting started." They offered the millers 65¢ per pound for oxide when the going rate was $1.10.[15] This stripping operation occurred before Nisley-Wilson took over the mill in June 1941, but this conduct was indicative of a plan to exclude the appellees from the business of manufacturing vanadium oxide on the Colorado Plateau. It is significant that during this period, when vanadium was in short supply and VCA was purchasing a large part of its requirements from USV, Nisley-Wilson was unable to market its products to either USV or VCA.

The evidence strongly indicated that Apex went out of the ferro-vanadium business because a fire destroyed a part of its equipment, and because the operations were unprofitable, due in part to its unsatisfactory relationship with Continental. It is undisputed that Apex approached VCA to sell its equipment and stockpile, but it is also inferable that VCA's interest in the Apex equipment and stockpile was generated by the plan to discourage independent milling. It is also permissible to conclude, as the jury apparently did, that USV unduly delayed consummation of the Toll Agreement for MRC, and that the inordinate length of time between the final arrangements in October and the furnishing of the first ore in April were unjustified and intended to forestall Nisley-Wilson operations.

USV invokes the sovereignty of its actions as agent for MRC to immunize it from the incidence of the antitrust laws. They say that whatever was done in connection with the Toll Agreement was done as an agent for the government,

15. Mr. Burwell, responsible USV official on the Plateau, testified as follows:
"A. Well, I followed out instructions.
"Q. What were the instructions with respect to this little mine, a rather valuable mine that was owned by the independent?
"A. Well, to discourage them in any way we could. They offered the vanadium oxide to us for sale. I offered them 65¢ a pound for the oxide. We couldn't offer them any more. We didn't encourage them to produce any vanadium. We discouraged them.
"Q. Did you ever get your hands on that claim?
"A. Oh, yes.
"Q. How did that happen?
"A. We made an arrangement with the Molybdenum Corporation of America to sublease under Brown the claims that are in the cliffs and mountains around the Gateway Alloy plant. The Gateway Alloy plant was down in a canyon, and these mines are about 1,500 to 2,000 feet above it. The roads and trails went up. Took a lease on these claims, sublease, and paid the balance of the royalties into the Molybdenum Corporation, and on-the-ground deal and an overriding royalty to Harry Brown, and I think we moved out 12,000 to 15,000 pounds of easily accessible cheap ore from there to Uravan, a haul of about 65 miles. We constructed a road up there and we cleaned out their accessible ore deposits.
"Q. Wasn't that more expensive than the ore you could have mined from your own properties?
"A. Yes, that ore cost us more than the ore we had immediately available at our own plant, because our own plant was located right here and our mines were within 10 miles of that plant, and these mines were located at Gateway, and we had 45 to 65 miles of haul down a rough road here, and of course, that haul was costly.
"Q. If that cost you more to get that ore rather than to get your own ore, why did you do that?
"A. Well, we wanted to keep another vanadium operation from getting started.
"Q. Whose instructions were you operating under when you did that?
"A. I was operating under the instruction of Mr. Van Fleet, from the letters you have already introduced.
"Q. Was that during the War?
"A. No, this is prior to the War, your Honor. This was prior to the War.

MRC, and that regardless of their motives, no liability can attach under the antitrust laws. What we said in that respect in Balsley is apposite here, and we may add that it is one thing to incite or influence government action which results in monopolistic practices as in Eastern Railroad Presidents Conference v. Moerr Motors, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464. It is quite another thing to utilize, or attempt to utilize, governmental powers conferred upon a private agency such as USV for unintended and illegal ends. See Balsley, p. 34. The Toll Agreement was terminated promptly on January 1, 1944, at the direction of MRC, at a time when vanadium was in over-supply and the government emergency procurement program had largely served its purposes.[16] The MRC directive, dated December 1, 1943, required USV to give Nisley-Wilson thirty days notice that the Toll Agreement would not be extended beyond its expiration date (January 1, 1944) "unless you have reason to believe that the procurement should be continued in the interest of the procurement of other products than vanadium."[17] This directive originated in Washington. It constituted governmental action and it was entirely consistent with governmental policy to discontinue the emergency procurement program.[18] There is nothing to indicate

16. MRC continued to operate its vanadium plants at Durango, Colorado and Monticello, Utah until February 1944, but it was a government operation as distinguished from operations under the Toll Agreement.

17. Attached to the termination directive addressed to USV was a letter from the Vice Chairman of the War Production Board to the Secretary of Commerce, dated November 22, 1943, in which reference was made to the vanadium ore program on the Colorado Plateau and to problems as, "a result of which it appears necessary to completely alter the responsibilities and functional operation of the entire vanadium program.

"In the first place, the supply-demand situation of vanadium has changed substantially in recent months. It now appears that the total requirement of vanadium can be supplied by those plants which are owned and operated by private industry without recourse to either of the two government plants referred to above or to the program with respect to subsidized operation at the Nisley & Wilson, Gateway plant.

"In this connection, it is important that the operations at all three of these plants, although previously necessary in the interest of the war program, have been carried out at a loss to the government because of costs involved which were in excess of the price which could be realized for the final product; vanadium pentoxide.

"At the same time, it has developed that the Army is actively interested in this same vanadium program for reasons other than vanadium. This Army program has reached a point where the entire emphasis of the program is now on materials other than vanadium. Under the circumstances, therefore, the program can no longer be considered a vanadium program and it cannot continue to be operated as such, by or under the direction of the War Production Board."

18. On December 13, 1943, Nisley and Wilson wrote to Mr. Henry J. Leir of the Continental Ore Company, in part as follows:

"The trend in this section is for the Metals Reserve Company to relinquish ore-buying contracts and drop out of the ore-buying business. Control of production is to be returned to individual companies.

"The most serious problem which will arise out of the change of control, as far as the production of vanadium is concerned, is the buying of vanadium ores. The M.R.C. have raised the price of ore to such a high level that it will make the cost of the finished product 20¢ over the old price of $1.10. It will not be possible at the present time at least to buy the crude ore at the prices existing before the M.R.C. began buying ore. The M.R.C. raised the raw ore price from the old level of 21¢ to 31¢ per pound of contained $V_2O_5$. The hauling price was also raised on the ore. The raises will amount to about 20¢ per pound of recovered vanadium pentoxide. This raise can be readjusted in time but at present labor is scarce and also costs more per ton of ore produced. The raise in ore price is the only serious problem which we see in the way of production.

"We would appreciate any information which you may be able to give us concerning a market for the vanadium after the first of the year and also the price.

that USV exercised any control, or even influence, in its initiation. The government-owned plants at Durango and Monticello ceased operations in February of 1944, and appellants' plants at Uravan and Naturita were either closed or their operations greatly curtailed. By November of 1943, the demand for vanadium had been "satiated, the shortage was at an end." [19] These facts are undisputed in the record and they speak for themselves.[20] We are thus brought to the conclusion that the termination of the Toll Agreement cannot be imputed to a conspiracy to monopolize, attempt to monopolize, or to individual attempts to monopolize.

But even so, it is fairly inferable that more forces were at work to bring about the downfall of the Nisley-Wilson enterprise than the mere forces of nature or the inexorable laws of economics. In determining whether a jury finding of actionable damages is justified by the record, we must consider the plight of the enterprise in the environment of an established conspiracy to monopolize or attempt to do so. We must proceed on the factual premise that the appellants had set about to deter and hamper the appellees wherever they could. While the surface tributary ore was removed before Nisley-Wilson succeeded to the venture, we cannot say that the mill was not physically and technologically capable of profitably producing oxide ore in a free market. Nor can we positively say that they were not deliberately excluded from the available market during the infancy of the enterprise and when it was delicately balanced between success and failure. Nor are we able to

repudiate an implicit finding by the trier of the fact that they were deliberately deprived of the full benefit of the Toll Agreement during the MRC program when vanadium was in short supply. As we have seen in Balsley and from evidence of record, with the advent of the Manhattan project in the latter part of 1942, interest on the Plateau shifted from vanadium to uranium. Plant equipment was modified to process uranium sludge. There was evidence to the effect that Nisley-Wilson had conducted some experiments, and from a survey of the USV uranium plant at Uravan, determined that with little modifications, their plant was also capable of processing uranium sludge for which there was a very definite market. There was evidence to the effect that their attempts toward readying their plant for this process were met by the positive statement of a USV official that "I won't permit you to get into the uranium business"; and "I don't intend to let you operate." While these incriminating statements may have been apocryphal, no one familiar with this record can doubt the power and ingenuity of the responsible maker of the statements to make good his boast. The fact is that they didn't operate, while at the same time USV and VCA were entering into contracts with the government to process uranium sludge for the vital requirements of the Manhattan project. True, the contracts were secret and not for profit, but they kept the mill wheels turning until the coming of the uranium bonanza in 1947. Viewed in this setting, we cannot say that the jury's finding of attributable harm is unsupported in the record.[21]

We would like to formulate plans as soon as possible for the change in operation.

"We appreciate very much your past cooperation and sincerely hope that plans can be made for an operation which will be of mutual benefit."

19. Quoted from appellees' brief.

20. Wilson testified that they did not commence operations after cancellation of the toll agreement because there was "no sale for the vanadium * * * no outlet for it at all."

21. Nisley summarized his case as follows: "When we were denied the right to get into the uranium program at that time by Mr. Burwell, coupled with the fact that U. S. Vanadium had already stripped the ore bodies that were contributory to our plant, which had the effect of slowing down the ore delivered during the Metals Reserve period together with the fact that we were held out of practically all of our production for approximately six to nine months during the part of the Metals Reserve program when every-

The appellants challenge the amount of the verdict as based upon wholly erroneous criteria for damages. In addition to the general instruction, applicable alike in the consolidated cases, concerning the necessity for proving by a greater weight of the evidence the combination and conspiracy, with resulting damages, and the amount thereof, the Court instructed the jury with respect to the Nisley-Wilson case that if they found by a preponderance of the evidence that the appellants violated the antitrust laws as they had been instructed on the subject, and that because of these violations, Nisley and Wilson were unable to operate their mill, they were entitled to damages, based upon the "probable and inferential proof," as well as by direct and positive proof; that in considering the amount of the damages, they could take into consideration (1) the expense involved in establishing the business; (2) the increased cost incurred in running the business by reason of antitrust violations; (3) the inability to make profits which would otherwise have been made but for such violations; and (4) the diminished value of the appellees' business by reason of being excluded from the market. With respect to prospective profits, the jury was instructed that if they found that Nisley and Wilson would have continued to succeed in the vanadium, and later the uranium industry but for the violations, they might, in calculating the damages, consider the business records of the appellees, their experience, know-how, and knowledge in comparison with the success of the appellants as disclosed in their business records and the expert opinion of witnesses, including Frank Nisley. The jury was then again reminded that they must first find by the greater weight of the evidence the alleged violations and their injurious impact upon the appellees.

The verdict in the sum of $40,000.00 is based primarily upon the operating records of the Nisley-Wilson mill through-out the Toll Agreement, and also upon Nisley's estimation of the profits the mill would have earned, if it had been free from the fetters of the combination and conspiracy. We know that loss of profits and diminishment of assets are proper elements of damage, and we know too that the owner of the affected business is competent to testify concerning his opinion of damages. And see Atlas Building Products Co. v. Diamond Block & Gravel Co., supra. There was, to be sure, testimony to the effect that the mill never earned a profit at any time, even under the Toll Agreement, and that it failed by reason of economical and technological factors, of which the appellants had no control whatsoever. See Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544; Atlas Building Products Co. v. Diamond Block & Gravel Co., supra; Twentieth Century-Fox Film Corp. et al. v. Brookside Theatre Corp., 8 Cir., 194 F.2d 846. But, all of these discrepancies, inconsistencies, and even incongruities were for the jury, and we are unable to say that the economical factors which entered into its verdict were irrelevant to the ultimate issue.

The judgment is affirmed.

## No. 6320
## UNION CARBIDE AND CARBON CORPORATION and VANADIUM CORPORATION OF AMERICA
### vs.
### JOHN F. WADE, ET AL.

Like Nisley-Wilson, this case is an alleged facet of the conspiracy to monopolize, and attempt to monopolize, described and sustained in Balsley. The appellees, suing as members and representatives of members of a dissolved partnership, claim to have been driven out of business by force of the monopoly by means of which they were forced to sell valuable mining claims on the Plateau to USV for grossly inadequate con-

thing you had could be sold, that put us at such an economic disadvantage with the big companies that it just wasn't practical to attempt to go ahead.

sideration.[22] The appeal is from a judgment based on a jury verdict in the sum of $200,000.00, representing the reasonable value of the claims, tripled to $600,000.00.

Also as in Nisley-Wilson, we start with an established conspiracy to monopolize the mining processing and marketing of vanadium and its products on the Colorado Plateau. The burden of our inquiry here is the sufficiency of the evidence to support the findings of the jury to the effect that the claimants were damaged as a proximate result of the monopoly, and if so, whether to the extent of its verdict. Some background facts related to Balsley and Nisley-Wilson are appropriate to bring this case into its proper perspective with those cases.

In 1939, John Wade, Thomas Curran and H. R. Redington obtained two carnotite ore leases on the Navajo Reservation known in this case as the "Martin Claims." In the latter part of 1941, Redington began negotiations to sell these claims to VCA. The plan was for Redington to covertly obtain an option from Wade and Curran on their interest and then turn them over to VCA, and thus "get rid of Curran and Wade." VCA wanted the claims to put together with others as a nucleus for an operation in that area, the ore to go to the government-owned VCA-operated mill at Monticello.[23] When Redington was unable to secure options on the Wade-Curran interest in the leases, he sold his undivided ⅓ interest to VCA for the sum of $13,000.00 in June 1942. Meanwhile and in May 1942, Curran wrote to USV, seeking to sell vanadium ore to the government-owned USV-operated mill at Durango. Curran's letter addressed to USV's General Superintendent at Uravan was transmitted to VCA in New York. When, however, the MRC vanadium-ore-buying program, described in Balsley and Nisley-Wilson, was commenced in May 1942 through USV as its agent, the field representative of USV-MRC negotiated with Wade and Curran for their ore from the Martin Claims.

The assignment of Redington's undivided ⅓ interest to VCA was disapproved in September 1942 by the Department of Interior because VCA and Wade and Curran were unable to work out an operating agreement covering the lease. The ore from these claims was mined and delivered under the USV-MRC contract to the Durango mill by a partnership composed of Wade, Curran and Redington, until the contracts as revised and amended from time to time were finally cancelled in February 1944.

In the early part of 1943, Thomas Curran told the USV-MRC field representative of another ore discovery on the Navajo Reservation and of his financial inability to comply with the Departmental requirements to obtain a lease on the claims. Curran asked the USV-MRC representative to assist him in getting financing from MRC. When MRC

---

22. The triable issue was submitted to the jury in the following instructions: "The plaintiffs Wade and Curran claim * * * that the United States Vanadium, and later Union Mines, both wholly-owned subsidiaries of Union Carbide, acquired their properties pursuant to a conspiracy to monopolize the vanadium industry, and as a direct result of a plan to keep these claims from becoming a nucleus for the maintenance of a vanadium mill operated by outsiders to the conspiracy."

23. On October 23, 1941, VCA's General Manager wrote to Superintendent of the Monticello plant on the subject of Navajo Indian land in part as follows: "The idea now is for Redington to obtain an option from Curran and Wade on their interests and then turn the whole thing over to us. I believe that if we can get these Redington claims, together with what we may develop on our lease lands, we may have the nucleus of an operation in that area, the ore to go to Monticello. Please don't say anything about this deal with Redington, since he is trying to get options from Curran and Wade before they get wise to the fact that he is dealing with us. I have gone into this matter with the Indian office in Washington and there will be no trouble about the transfer of Redington's lease to us for cash, provided he can get rid of Curran and Wade."

refused to make a loan, the USV-MRC representative asked USV to provide the necessary financing and USV agreed. A partnership entitled Curran Brothers and Wade was the successful bidder for a prospecting permit on approximately 168 square miles of the Navajo Reservation, which included the discovery. The partnership made a down payment of $1,000.00 on the bonus price for the permit and USV purchased an undivided ⅔rds interest in consideration of the payment of the balance of the bonus price in the sum of $4,000.00, and an agreement to procure the necessary bond, have the area surveyed and mapped, and pay ⅔rds of the cost of the roads and other improvements. In accordance with applicable departmental regulations, the permittees selected 960 acres within the prospecting permit on which a lease was ultimately issued to the partnership composed of Thomas Curran, Charles Curran and John Wade. An undivided ⅔rds interest was immediately assigned to USV. Thereafter and by agreement of the parties, the 960-acre lease was divided in severalty and Curran Brothers and Wade became the separate owners of ⅓rd of the leases known here as the "Cove Mesa Claims."

Contemporaneously with these events, the Manhattan District was created for the purpose of developing the atomic bomb, and became interested in the exploration for uranium ore on the Colorado Plateau. General Groves, who was in command of the Manhattan project, selected USV and its wholly owned subsidiary, the Union Mines, to conduct exploration on the Plateau. In May 1943, it entered into a letter contract with Union Mines to "conduct preliminary reconnaissance, surface prospecting, detailed geological mapping, sub-surface prospecting, and other physical exploration and development work at promising locations of S-37" (the secret code word for uranium); and "When promising deposits of S-37 [i. e. uranium] are discovered or are reasonably believed to exist as a result of the work hereunder, the contractor [Union Mines] shall make recommendations to the contracting officer for the acquisition of the strongest possible control of the production and disposal of the desired resources." The work was to be performed at the expense of the government without profit or fee to USV or Union Mines. Like every other phase of the Manhattan project, information relating to the work contracted for was classified and restricted under penalty of applicable criminal law. Comprehensive monthly progress reports were to be submitted as promptly as possible covering all phases of the work in progress and which was contemplated. A colonel in the Corps of Engineers in charge of the raw material section of the Manhattan project was placed in command and supervision of the Union Mines program on the Plateau, and directed its operations from the very outset.

Immediately after the issuance of the prospecting permit to Wade-Curran, and the assignment of ⅔rds interest to USV, Union Mines' exploration crews, under the direction and supervision of the Army command, went upon the area covered by the permit and conducted extensive exploration before the deadline fixed in the permit for the selection of the area to be included in a departmental lease. As a result of this work, "a number of mineral deposits with attractive possibilities" were discovered.[24] Be-

24. In a confidential and restricted memorandum of events and conversations between representatives of USV, Union Mines and the Colonel in command of the Union Mines project on the Plateau, dated November 30, 1943, the Colonel stated in part as follows: "On or about 26 August 1943, and subsequent to the date the sub-deal between USV and Wade & Curran was made, Union Mines started exploratory work on the property with one field party. A few weeks later the Union Mines' exploratory force working on the property was increased to two field parties and during October the force was still further increased to three field parties. The work being done by Union Mines on the property was inspected by a representative from this office during the early part of November

cause of the restricted and confidential nature of the Union Mines agreement with Manhattan and the work to be performed thereunder, Wade-Curran did not know of the government's interest in the area for uranium, and indeed did not know of the relationship between USV's Union Mines and Manhattan.

According to the restricted memorandum referred to in Note 22, and other undisputed record evidence, soon after USV's acquisition of the ⅔rds interest in the prospecting permit, USV notified the Plateau Director of the Manhattan project that they were holding such interest "primarily for the benefit of Union Mines in order to facilitate its work on the Navajo Indian Reservation"; and that "arrangements could probably be made for Union Mines to acquire all of USV's interest in the deal by reimbursing USV for the actual expenses it had incurred if it were deemed advisable for Union Mines to make such an acquisition." The USV interest in the lease was eventually transferred to Union Mines without profit, and contemporaneously therewith negotiations were commenced between Wade-Curran and USV-Union Mines to acquire the Mesa Cove leases representing the other ⅓rd interest in the original 960-acre lease. The Corps of Engineers specifically authorized USV-Union Mines to purchase the Cove Mesa lease for the sum of $12,500.00, $3,500.00 to be paid on the execution of an option, and the remainder upon formal transfer with approval of the Department of Interior.[25] The transaction was finally consummated on the following April 17, 1944. The leases were originally taken in the name of

MRC because the Corps of Engineers was not authorized to own mineral interests. It was, however, eventually transferred to Union Mines, and upon the conclusion of the Manhattan project, the entire lease was transferred to the Atomic Energy Commission in 1947, and by it leased to VCA, which operated it extensively and profitably for uranium under the AEC program.

In summary, the factual theory on which the appellees rely to support the jury's verdict is to the effect that as a part of the conspiracy to monopolize ore claims on the Colorado Plateau, USV and VCA agreed that the area in which the Wade-Curran Martin Claims were located would be apportioned to VCA; that in order to eliminate Wade-Curran, VCA connived with their partner, Redington, to acquire the Martin lease as part of its operations tributary to the Monticello Plant; that after VCA was unable to acquire the leases, USV used its MRC powers to negotiate discriminatory ore-purchasing contracts to the detriment of Wade and Curran and the benefit of VCA; that while Wade and Curran were in debt as a result of their operations, USV utilized its MRC powers to prematurely and purposively cancel Wade and Curran's MRC contracts for the purchase of ore from the Martin Claims; and, exercising its powers as another arm of the government through Union Mines, USV executed a "squeeze play" on Wade and Curran to bring about a distress sale of its Cove Mesa claims, with the knowledge that they were highly valuable for uranium, a fact unknown to Wade-Curran. The argument goes on to the effect that USV acquired the undivid-

and information so gathered indicates that as of that date, the Union Mines' forces had explored most of the property except a relatively small area on the south end and as a result of this work had discovered a number of mineral deposits with attractive possibilities. Also, arrangements were then being made to explore the rest of the property during the latter part of November and before the deadline date for selection of the 960 acres to be retained by Wade & Curran and USV."

25. On March 22, 1944, a USV representative in New York advised a Union Mines representative by inter-company correspondence that it was "propitious" to take immediate steps to purchase the Wade-Curran interest "as authorized by Mr. Guarin [the Army officer in charge of the Plateau operations] because of the fact that Curran Brothers and Wade have some $3,000.00 in outstanding obligations which they must meet."

ed ⅔rds interest in the Wade-Curran prospecting permit on behalf of itself for the purpose of furthering a pre-existing conspiracy to monopolize the industry by eliminating outsiders; that it was more interested in getting rid of Wade-Curran first, and then deciding whether under all the circumstances it could hold on to the properties for its own benefit, or whether the situation required it to turn the properties over to the government.

At this point it is important to note again, as we did in Balsley and Nisley-Wilson, that in the latter part of 1943 and the first part of 1944, when the search for uranium was under way, the war-time need for vanadium ore had been fully satisfied, and the MRC emergency-purchasing program was at an end. Accordingly, on December 11, 1943, MRC's Executive Vice President notified its agent, USV, to discontinue the purchase of all rosceolite ores from VCA as soon as practical, not later than December 24, 1943; and to "proceed, where contractual rights permit, to notify all producers, including Vanadium Corporation of America, that the Metals Reserve Company's vanadium-buying program will terminate on February 28, 1944, but in all cases where in your opinion, existence of cancellation right is doubtful, please forward to us immediately a copy of the contract with proposed notice of cancellation. * * * arrange for orderly liquidation of miscellaneous agreements and leases in connection with the ore-purchasing program."

A 30-day notice of cancellation, dated January 29, 1944, was sent to all ore producers with contracts under the MRC ore-buying program, including Wade-Curran. A government attorney was sent to the Plateau for the purpose of assisting in the termination of the contracts, the duration of which were in dispute. The government-owned Durango mill was shut down on February 29, 1944 and no ore was accepted under the MRC program after that date. Wade-Curran protested the cancellation of their contract directly to the USV-MRC representative on the Plateau who had negotiated the contract, and also to the MRC in Washington. They insisted that their contract was for the duration of the war and requested permission to deliver sufficient ore to liquidate their outstanding obligations in the approximate amount of $3,000.00. At first they refused to discuss the matter with the government attorney. Finally, and on March 15, 1944, in a letter, the text of which was dictated by MRC in Washington, USV-MRC notified Wade-Curran that to comply with their request to be reimbursed for their $3,000.00 indebtedness or accept delivery of additional ore in that amount "would result in your receiving special treatment not accorded to any other vanadium ore producers in the Sandstone Vanadium Area." After some further negotiations, the ore-purchasing agreement was finally cancelled by mutual consent on April 19, 1944. It was the last ore-purchasing agreement to be formally cancelled. It is thus unmistakably plain that the MRC vanadium-ore-purchasing contracts with Wade-Curran were terminated by governmental action, even as the Toll Agreement in Nisley-Wilson. As we have seen, both agreements were cancelled in recognition of the termination of the MRC emergency vanadium-ore-purchasing program.

It may well be, however, that the attempted acquisition of the Martin Claims by VCA in 1941 was a part of a plan to cartelize the vanadium ore claims on the Colorado Plateau. And, it may also be accepted for purposes of this case that USV, acting for MRC, negotiated disproportionately low ore prices with Wade-Curran as compared with contemporary ore prices with VCA in furtherance of the conspiratorial plan. This issue is presented by Wade-Curran as plaintiffs in the Balsley case. And, it may also be assumed for purposes of this case that USV contrived to buy into the Wade-Curran prospecting permit as a part of the same plan of monopolization.

But, whatever may have been USV-VCA plans in that respect, we are certain that the Manhattan District entertained

no such plans or designs for its contractor; and we are furthermore certain that the Army, acting in the name of Manhattan District, exercised complete control of and shaped the critical events to come. The undisputed proof is that the contract with Union Mines was entered into in accordance with the customary practices of the Corps of Engineers to contract for the performance of its governmental functions. As its field representative for the performance of the Union Mines contract, USV selected the same employee (a Mr. Hill) who had negotiated the suspected ore-purchasing contracts under the USV-MRC vanadium ore-purchasing program. But the Army officer in command of the project on the Plateau promptly replaced the USV employee with a Mr. Ridgeway, a hard rock geologist from the Bureau of Mines. The evidence is undisputed to the effect that Manhattan instructed USV-Union Mines to gain access to the Navajo Reservation for the purpose of conducting extensive explorations for uranium on a large area. The responsible Army officer testified that he learned of USV's interest in the Wade-Curran exploration permit just a few days after its acquisition; and that it was "just perfect for the purposes we had in mind." The record shows that USV acquired its ⅔rds interest in the permit on August 24, 1943. Two or three days later, Union Mines'

crews were on the reservation under the direction of Manhattan. (See Note 24).

USV's ⅔rds interest in the permit was transferred to the government at cost, and the responsible Army officer on the Plateau directed the purchase of, and dictated the price to be paid for, the other ⅓rd interest known as the Wade-Curran Cove Mesa leases, with knowledge that Wade-Curran was in debt in the sum of $3,000.00.[26] The entire interest thus acquired was held by the government until leased to VCA for uranium operations under the AEC program in 1947. The bare fact of USV's acquisition of the property and its ultimate assignment to VCA by AEC does tend to generate suspicion in a conspiratorial environment. In this setting, their every act was suspect. Nevertheless, it cannot be said on this record that the acquisition of this property by the government through confidential and restricted governmental action was in furtherance of the conspiracy to monopolize or attempt to monopolize the uranium industry on the Colorado Plateau. No one seems to suggest that the AEC-VCA transaction in 1947 was in furtherance of a pre-existing conspiracy. But, if they do, no one suggests the legerdemain by which the circuitous feat was accomplished. Surely it cannot be said that they utilized the AEC powers to that end.

26. The Army officer testified in this respect as follows:

"A. Well, the first time I heard about these people [Wade and Curran]—this was the second time—any problem that I had to get into that concerned these people—the first time I heard about them they needed $4,000.00 I believe it was, to complete a contract to buy this exploration lease, and they didn't have any money to pay it with. The next time I heard about them they were in debt, so it was told me, $3,500.00. Now, I mean, it was just a natural thing to me. It just seemed to me that that's the kind of people we're dealing with. And it also meant to me—I mean, to me personally—that here was probably a legitimate reason why they wanted to sell; and otherwise, I'd be a little suspicious maybe that everything wasn't as being represented to me, maybe they're try to sell a white elephant or something. * * * Q. Who made the final determination of the price which Union Mines would pay for these and other properties? A. I did. On the recommendation of Union Mines. My directive from General Groves was—and that was in the contract, too—I mean, I'm an Army officer, and I had to follow orders in my directives. And my directives were in any of these acquisitions that Union Mines had to make a formal written recommendation of what was a fair price to pay. And that had to be a fair price to the party that they were buying from and a fair price to the government. But we had to have their recommendation in writing. Now, that didn't mean that I had to agree to that, but I first had to have that recommendation."

In this critical respect, this case is different from Balsley, wherein the USV-MRC ore-purchasing contracts were under the discretionary control of USV as agent of MRC, with discretionary power to negotiate contracts for the effectuation of its monopolistic plans. And, this case is also decisively different, we think, from Nisley-Wilson, wherein the conspirators were enabled to enfeeble their intended victims by forestalling the performance of the Toll Agreement, and then taking advantage of governmental cancellation of it to effectuate their plan to eliminate Nisley-Wilson as a potential competitor in the milling business. The distinction lies in the fact that in Balsley and Nisley-Wilson, the conspirators possessed, and are conclusively found to have exercised, governmental powers, or taken advantage of governmental action, to their wrongful ends, whereas in this case, they lacked the power to commit the acts of which they are accused because of the positive intervention of governmental action. In these circumstances, we conclude that the judgment cannot be factually supported, and it is reversed.

PICKETT, Circuit Judge (dissenting in part).

I respectfully dissent from that part of the opinion which deals with the class action. After the liability of the defendants had been established by verdict, the trial court interpreted Rule 23(a) (3) as authorizing individuals who had not been named as parties but were alleged to have been damaged by defendants' unlawful acts to take full advantage of the verdict by filing claims within a specified period, appointed a master to determine the amount of their damages, and directed attorneys for the class to notify them of the verdict in their favor and the court's judgment. This section of the rule defines as a class action one involving numerous persons whose rights are several, but are affected by a common question of law or fact, and in which a common relief is sought. The action defined is neither a true class action nor one in which an adjudication of claims which do or may affect specific property involved in the action is sought. The section permits the adjudication of in personam claims in one action when there is no privity between the members of the "class" and the right or liability of each is distinct, and suits brought under it are usually referred to as "spurious class actions." I find no case in which it has been held that the rights of a non-appearing member of the "class" would be affected by a judgment entered in the action. Instead the law appears to be as stated in Oppenheimer v. F. J. Young & Co., 2 Cir., 144 F.2d 387, 390:

"[W]e recently supported such a class action and adverted to the settled rule in the Second Circuit that members of the class who are not joined in such a class suit will not be affected by the decision. In other words, the decision will only be res judicata as to the plaintiffs and the parties who have intervened."

The history of Rule 23(a) (3) illustrates, I think, without any doubt, that the class suit contemplated was no more than a permissive joinder device, in cases in which federal jurisdiction has been established, to permit the disposition of claims having common questions of law or fact in one action, without further jurisdictional limitations. The rule was not intended to create a procedure whereby a judgment would determine the rights of non-appearing class members as in other class actions. Professor Moore, who was a dominant force in the formulation of the rule, says:

"The spurious class suit is a permissive joinder device. The presence of numerous persons interested in a common question of law or fact warrants its use by persons desiring to clean up a litigious situation. While a purist may not like to have the third type of class action termed spurious, this label serves to direct attention to the practical realities of litigation. The character of the right sought to be enforced for or against the class is

" '(3) several, and there is a common question of law or fact affecting the several rights and a common relief is sought.'

"There is no jural relationship between the members of the class; unlike, for example, the members of an unincorporated association, they have taken no steps to create a legal relationship among themselves. They are not fellow travellers by agreement. The right or liability of each is distinct. The class is formed solely by the presence of a common question of law or fact. When a suit is brought by or against such a class, it is merely an invitation to joinder—an invitation to become a fellow traveller in the litigation, which may or may not be accepted. It is an invitation and not a command performance." (Footnote omitted)—3 Moore's Federal Practice § 23.10 (2d Ed. 1948.) In All American Airways, Inc. v. Eldred, 2 Cir., 209 F.2d 247, 248–249, Judge Clark, who was the official reporter for the Advisory Committee preparing the Federal Rules of Civil Procedure, in commenting on actions contemplated by 23(a) (3), said:

"In justice to the litigants it must be admitted that there still seems considerable confusion as to the meaning and effect of the third group of class actions authorized by F.R. 23(a), 28 U.S.C.A., a confusion not lessened by the load it bears in its popular legal cognomen of 'spurious class action.' There is perhaps something anomalous in apparent legal participation in a lawsuit by persons unnamed and unidentified as individuals who, unless they show themselves by intervening, remain legally unaffected by any action taken in the case. The legal rationale lags behind the practical utilities found in the device and its 'psychological value' (3 Moore's Federal Practice 3445, 2d Ed. 1948) on courts and potential litigants. It stands as an invitation to others affected to join in the battle and an admonition to the court to proceed with proper circumspection in creating a precedent which may actually affect non-parties, even if not legally *res judicata* as to them. Beyond this, as we in common with other courts have pointed out, it cannot make the case of the claimed representatives stronger, or give them rights they would not have of their own strength, or affect legally the rights or obligations of those who do not intervene. Oppenheimer v. F. J. Young & Co., 2 Cir., 144 F.2d 387; California Apparel Creators v. Wieder of California, 2 Cir., 162 F.2d 893, 174 A.L.R. 481, certiorari denied 332 U.S. 816, 68 S.Ct. 156, 92 L.Ed. 393; 3 Moore's Federal Practice 3447–3456 (2d Ed. 1948). True, in Dickinson v. Burnham, 2 Cir., 197 F.2d 973, 979, certiorari denied 344 U.S. 875, 73 S.Ct. 169 [97 L.Ed. 678], we noted a query advanced by text writers to the possibilities of extending the scope of *res judicata,* where adequate notice and specific opportunity to come in have been accorded the persons represented; but it is obvious that here in any event no such compulsive notice as the writers visualize is possible as to the unascertained property owners." (Footnote omitted.)

In Nagler v. Admiral Corp., 2 Cir., 248 F.2d 319, 327, Judge Clark said the rule "is in actual effect really little more than an invitation to non-parties closely interested to intervene." In an earlier case, Judge Clark referred to the effect of the rule in these words:

"It does not grant authority to adjudicate finally rights as to nonappearing parties or to confer any additional substantive rights upon the plaintiffs suing. Oppenheimer v. F. J. Young & Co., 2 Cir., 144 F.2d 387; 2 Moore's Federal Practice 2235–2245, 2291; 46 Col.L.Rev. 818, 55 Yale L.J. 831; cases cited in Clark on Code Pleading, 2d Ed. 1947, 405, 407. Hence the rights of the rest of

the 4,500 potential plaintiffs are actually not to be settled here, and we cannot give judgment as though they were. We stress this point because at times there appear to be suggestions that the representative character of a suit may aid in recovery." (Footnotes omitted). California Apparel Creators v. Wieder of California, Inc., 2d Cir., 162 F.2d 893, 897, cert. denied 332 U.S. 816, 68 S.Ct. 156, 92 L.Ed. 393.

Other courts have taken the same view. Bascom Launder Corp. v. Telecoin Corp., 2 Cir., 204 F.2d 331, cert. denied 345 U.S. 994, 73 S.Ct. 1133, 97 L.Ed. 1401; Kainz v. Anheuser-Busch, Inc., 7 Cir., 194 F.2d 737, cert. denied 344 U.S. 820, 73 S.Ct. 17, 97 L.Ed. 638; Schatte v. International Alliance of Theatrical Stage Employees, 9 Cir., 183 F.2d 685, cert. denied 340 U.S. 827, 71 S.Ct. 64, 95 L.Ed. 608; Oppenheimer v. F. J. Young & Co., supra; Athas v. Day, (D.C. Colo.) 161 F.Supp. 916, 186 F.Supp. 385. Cf. Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22. It is obvious that Rule 23(a) (3) furnishes a useful but limited vehicle for the effective disposition of claims for injuries to the number of parties from the unlawful conduct of others. As pointed out by those who knew what was intended by the section, it merely provides a procedure which permits the disposition of all claims in one action in the instances defined, it did not create a new "class action" as that term is used in the law 3 Moore's Federal Practice §§ 23.10, 23.11, (2d Ed. 1948).

The plaintiff ridicules the doctrine of mutuality and estoppel of judgments as no longer having vitality, thoroughly discredited, and slowly dying. The doctrine has in some instances been justly criticized, but not in cases such as we have here, in which the claimants stand by, with no concern for the statute of limitations or the expense of litigation, waiting for an opportunity to take advantage of a favorable judgment without being bound by one that is adverse to their interest.[1] See Moore and Currier, Mutuality and Conclusiveness of Judgments, Tulane Law Review, Vol. XXXV, pp. 301–330 (Feb.1961). It might well be possible to devise a procedure which would bind non-intervening members of the "class," but the rule does not in its present form purport to accomplish this.

While as pointed out by Judge Murrah, some students and writers have advocated that Rule 23(a) (3) should be applied as it was by the trial court in this case, and the plaintiff has very eloquently espoused that theory, so far the courts have not looked upon the theory with favor, and we will be the first to fully accept and apply this novel interpretation. As so aptly put by our Chief Judge on another occasion, "It all sounds very well, but questions of law should not be disposed of on noise." I am convinced that the adoption of this concept of the rule will not only lead to its unfair use, but will be conducive to the undesirable solicitation of claims in tort cases in which there are multiple injuries.

---

1. In actions by third parties after a judgment unfavorable to them, the defense of the statute of limitations might be effective.